648 So.2d 1090 (1994)
STATE of Louisiana
v.
Calvin DUNCAN, a/k/a Calvin Jones.
No. 94-KA-1045.
Court of Appeal of Louisiana, Fourth Circuit.
December 28, 1994.
Rehearing Denied February 15, 1995.
*1094 Harry F. Connick, Dist. Atty. and Kim Madere Graham, Asst. Dist. Atty., New Orleans, for appellee.
Laurie A. White and Angela A. Gerrets, Law Office of Laurie A. White, New Orleans, for appellant.
Before KLEES, LOBRANO and WALTZER, JJ.
LOBRANO, Judge.
The defendant, Calvin Duncan a/k/a Calvin Jones, was charged by grand jury indictment with first degree murder, a violation of LSA-R.S. 14:30. A jury found the defendant guilty as charged. He was sentenced to life imprisonment at hard labor without benefit of parole, probation or suspension of sentence. Defendant appealed and this court affirmed his conviction and sentence in State v. Duncan, 517 So.2d 1270 (La.App. 4th Cir. 1987), writ denied, 536 So.2d 1232 (La.1989). Pursuant to Lofton v. Whitley, 905 F.2d 885 (5th Cir.1990), the defendant was granted an out-of-time appeal on January 10, 1994.
The facts of this case are set forth in this court's original opinion as follows:
At trial, the State presented the testimony of an eyewitness to the crime, Kristie Emberling. She testified that she and [David] Yeager were waiting at a bus stop on the corner of North Roman Street and Esplanade Avenue in New Orleans at approximately eleven p.m. on August 7, 1986 [sic, 1981].[1] Emberling testified that a man she later identified as Calvin Duncan and another man walked up to the bus stop. Duncan asked Emberling and Yeager if they wanted to buy or sell any marijuana. Emberling told Duncan that they were not interested, and the couple attempted to back away from the two men. Duncan made a comment about the ring Emberling was wearing and then suddenly said, "Hold it, don't move, give me your money." Under his jacket Duncan held a gun pointed at the couple. Yeager pushed the other man, and Emberling started to run. She heard a gunshot and looked back and saw Yeager limping approximately ten feet away. She then saw Duncan put his gun to Yeager's head and fire. She rushed to Yeager who had fallen in the street. Duncan fled. The other man searched Yeager's body, took his wallet and then also ran away.
Approximately six months later, the New Orleans Police received an anonymous tip that Calvin Duncan was the murderer. On March 7,[1982], Kristie Emberling positively identified Duncan from a photographic lineup. A warrant was issued for Duncan's arrest, and newspapers and television publicized Duncan's identification as a suspect. Meanwhile, Duncan had left New Orleans and joined the Job Corps program in Clackamas County, Oregon where, acting on the New Orleans warrant, Clackamas County officers arrested Duncan on August 6, 1982.

SUFFICIENCY OF EVIDENCE (ASSIGNMENT OF ERROR NO. 5)
In this assignment of error, defendant argues that no rational trier of fact could have found him guilty beyond a reasonable doubt of first degree murder. Defendant argues that the testimony of the alibi witnesses created reasonable doubt as to the eyewitness' identification of defendant as the murderer of David Yeager.
When both the sufficiency of the evidence and one or more trial errors are raised as issues on appeal, the reviewing court should first determine the sufficiency of the evidence. State v. Hearold, 603 So.2d 731 (La.1992). This is because the defendant may be entitled to an acquittal or a reduction of the conviction to a judgment of guilty of a lesser and included offense if the evidence is found insufficient under Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). Id.
When the entirety of the evidence, including any inadmissible evidence which was erroneously admitted, is insufficient to *1095 support the conviction, the accused must be discharged as to that crime; and, any discussion by the court as to trial errors would be pure dicta because those issues would be moot. Id. However, when the entirety of the evidence, both admissible and inadmissible, is sufficient to support the conviction, the defendant is not entitled to an acquittal; and, the viewing court must then consider the trial error issues to determine whether the defendant is entitled to a new trial. Id. If the reviewing court finds trial error which is not harmless in a case where it has found the evidence sufficient to support the conviction, the defendant must receive a new trial but he is not entitled to an acquittal even though the admissible evidence by itself was insufficient. Id.
The standard for reviewing a claim of insufficient evidence is whether, after viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could have found the essential elements of the offense proven beyond a reasonable doubt. Jackson v. Virginia, supra; State v. Rosiere, 488 So.2d 965 (La.1986). The reviewing court is to consider the record as a whole and not just the evidence most favorable to the prosecution; and, if rational triers of fact could disagree as to the interpretation of the evidence, the rational decision to convict should be upheld. State v. Mussall, 523 So.2d 1305 (La.1988).
Additionally, the reviewing court is not called upon to decide whether it believes the witnesses or whether the conviction is contrary to the weight of the evidence. Id. The jury's determination of credibility is not to be disturbed on appeal absent an abuse of the jury's discretion. State v. Cashen, 544 So.2d 1268 (La.App. 4th Cir.1989).
In 1981, R.S. 14:30 provided, in part:
First degree murder is the killing of a human being:
(1) When the offender has specific intent to kill or to inflict great bodily harm and is engaged in the perpetration or attempted perpetration of aggravated kidnapping, aggravated escape, aggravated arson, aggravated rape, aggravated burglary, armed robbery, or simple robbery;

* * * * * *
In 1981, R.S. 14:64 provided, in part:
Armed robbery is the theft of anything of value from the person of another or which is in the immediate control of another, by use of force or intimidation, while armed with a dangerous weapon.
Viewing the evidence in the light most favorable to the prosecution, we find that the State proved defendant's guilt beyond a reasonable doubt. Ms. Emberling positively and emphatically identified defendant as the person who shot Yeager after attempting to rob the couple of money at gunpoint. By finding defendant guilty, the jury obviously did not believe defendant's alibi witnesses. This assignment of error is without merit.

ASSIGNMENTS OF ERROR NOS. 1 & 2
In these two assignments of error, defendant complains about the admission into evidence of three inculpatory statements made by him. In the first assignment, defendant argues that the trial court erred in allowing Detective Loren Peterson to testify regarding statements made by defendant when he was arrested in Oregon on August 6, 1982. The defense claims that these statements should have been excluded because the arresting officers did not scrupulously honor the defendant's right to remain silent.
This court has already found no merit in this and other arguments in supervisory writ 89-K-2116 in which defendant sought review from the denial of his application for post-conviction relief. In that application, defendant raised the claim that his statements of August 6, 1982 should not have been admitted because his right to remain silent was not honored by the arresting officers. This court found no error in the trial court's denial of defendant's application for post-conviction relief.[2]
*1096 Defendant's second argument concerns statements made by him on August 16, 1982 and August 23, 1982 which he claims were obtained in violation of his right to counsel. In defendant's original appeal, he raised this same argument in a pro se brief. This court held that neither of these statements was obtained in violation of defendant's right to counsel. Duncan, 517 So.2d at 1272.
As for the statement of August 16, 1982, this court noted that the constitutional right to have counsel present during custodial police interrogation may be waived and found that the State affirmatively showed that defendant waived that right and talked freely with police without ever indicating that he desired to have an attorney present. Duncan, 517 So.2d at 1272. As for the statement of August 23, 1982,[3] this court found no error in the admission of this statement because it was made after defendant was informed of and claimed to understand his Miranda rights and was made without any inducement or threat and without any request for the presence of an attorney. Duncan, 517 So.2d at 1272.
Defendant, however, raises an additional argument not previously discussed, about the admissibility of these statements. His argument is predicated on the Sixth Amendment right to counsel. He argues that because he already had been appointed counsel at his extradition arraignment in Oregon, before these statements were made, they should not have been admitted into evidence because the police were barred from interrogating defendant in the absence of appointed counsel unless the defendant initiated communication. In support of this argument, defendant cites the United States Supreme Court cases of Michigan v. Jackson, 475 U.S. 625, 106 S.Ct. 1404, 89 L.Ed.2d 631 (1986) and Patterson v. Illinois, 487 U.S. 285, 108 S.Ct. 2389, 101 L.Ed.2d 261 (1988), and the Louisiana Supreme Court case of State v. Hattaway, 621 So.2d 796 (La.1993). The basic thrust of these decisions is that a defendant in a criminal matter, represented by an attorney, may not waive the assistance of counsel during interrogation. "Consequently, the state cannot, under such circumstances, obtain a waiver from the accused or otherwise communicate with him with respect to the offense ... except through the medium of defense counsel." Id. at 798.
We initially note that the above cited cases were all rendered subsequent to the interrogations at issue in this case, thus arguably posing an issue of retroactivity. However because we conclude that the introduction of the August 16, 1982 and August 23, 1982 statements constitute harmless error, we need not decide the retroactive effect of those decisions.
In State v. Hattaway, supra, the Louisiana Supreme Court applied a harmless error analysis to determine whether a confession by the defendant which the court found was made in violation of his right to be assisted by counsel contributed to his conviction. The court explained the harmless error test as follows:
"[W]e have examined the record to determine `whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction' and whether the error was harmless beyond a reasonable doubt * * *" (citations omitted) Id. at 815.
(See also, Arizona v. Fulminante, 499 U.S. 279, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991), which held that the admission of an involuntary confession obtained in violation of right to counsel is subject to a harmless error analysis.)
In finding that the admission of the defendant's confession and the fruits thereof were not harmless error, the Hattaway court noted that the inadmissible evidence formed the core of the State's case and explained further as follows:

*1097 "Without the confession and its fruits, the prosecution's evidence consisted only of Hattaway's cryptic oral admission of guilt to his cousin and the circumstantial evidence implicating him in the crime. This evidence did not necessarily paint Hattaway as the `trigger person' or the main mover in the criminal scheme. There was neither eyewitness testimony nor direct physical evidence placing Hattaway at the scene of the killing" Id. at 815.
In the instant case, the portions of the statements given by defendant after the appointment of Oregon counsel and to which defendant complains are as follows:
On August 16, 1982 Detective Peterson testified that defendant stated:
"He told me he didn't feel the witness would be able to identify him because his appearance had changed so much in the last year's period of time."
On August 23, 1982 Detective Demma asked defendant why he had left New Orleans and moved to Oregon in February of 1982. Demma testified:
"[H]e had seen his name in the newspaper implicated in a murder and with that, once he saw his name, that's when he left the city. He said his reason for leaving the city was to get a job and make some money so he could afford an attorney to come back to the city and fight this. He also, during the course of the interview questioned whether or not if he could be identifiedhis statement was, what would happen if she could not identify him when he was brought back."
The circumstances of the instant case differ greatly from those in Hattaway. The statements in question do not constitute an admission of guilt. In fact, the detectives to whom defendant made these statements both testified that defendant denied involvement in the murder of David Yeager. Detective Peterson stated that defendant also indicated at an earlier interview that he was being wrongly implicated in this murder because he was black and the victim was white. Although he had not been told of the victim's race, defendant told Detective Peterson that he assumed the victim was white because of the intensity of the police investigation. Therefore, when the defendant's statements testified to by the detectives are taken in context with the detectives' testimony as a whole, it is clear that these statements were not a confession of guilt.
Most importantly, this case unlike Hattaway, had an eyewitness who was with the victim at the time of the attempted robbery and shooting and who testified positively that she saw the defendant shoot David Yeager in the head after attempting to rob the couple of their money. In light of the strong eyewitness testimony in this case, the statements in question by the defendant were harmless beyond a reasonable doubt.

ASSIGNMENT OF ERROR NO. 3
In his third assignment of error, the defendant argues that the trial court erred in allowing Detective Marco Demma to testify that information was received from an anonymous caller identifying the defendant as the perpetrator of the shooting death of David Yeager. According to defendant, this testimony was hearsay and its admission violated his right to confront and cross-examine his accuser.
A review of the record shows that no objection was made by defense counsel when Detective Demma testified that an anonymous tip had been received on the Crimestoppers hotline identifying the defendant as Yeager's killer. The lack of a contemporaneous objection precludes appellate review. LSA-C.Cr.P. art. 841. This assignment of error is without merit.

ASSIGNMENT OF ERROR NO. 4
In his fourth assignment of error, the defendant argues that he was denied due process and his right to a fair trial because the prosecution withheld from the defense exculpatory and impeachment evidence which would have changed the outcome of the trial or created a reasonable doubt that did not otherwise exist had it been disclosed to the defense. According to the defendant, the withheld evidence included: (1) the initial police report; (2) the names of other persons who witnessed the perpetrators fleeing the scene; (3) the August 26, 1982 investigative *1098 report which allegedly contained statements from the key witness, Kristie Emberling, indicating that after she identified the defendant, she stated that she was not sure about her identification; (4) the transcript of Kristie Emberling's grand jury testimony; and (5) the written statement signed by Kristie Emberling.
In Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), the United States Supreme Court held that "the suppression of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or punishment." See also, C.Cr.P. art. 718. However, the prosecution does not have the duty to provide defense counsel with unlimited discovery of the State's case. United States v. Agurs, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976).
Evidence is material, and hence discoverable, if there is a "reasonable probability" that the outcome of the trial would have been different had the evidence been disclosed to the defense. United States v. Bagley, 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985). However, the mere possibility that undisclosed information might have helped the defense or affected the outcome of trial does not establish the materiality of that information. United States v. Agurs, supra. The undisclosed information must be evaluated in the context of the entire record; and, if there is no reasonable doubt about the defendant's guilt irrespective of this evidence, there is no justification for a new trial. State v. Paul, 499 So.2d 1288 (La.App. 4th Cir.1986), writ denied, 503 So.2d 475 (La.1987).
Defendant argues that the initial police investigative report, Ms. Emberling's grand jury testimony, and her written statement should have been disclosed because the description of the gunman contained in those documents allegedly differed from Ms. Emberling's trial testimony. Although a defendant is generally not entitled to the discovery of reports, memoranda, or other internal state documents made by the district attorney or State agents or to witnesses' statements made to the district attorney or State agents, the State is constitutionally required to produce exculpatory evidence upon the defendant's request. State v. Clark, 581 So.2d 747 (La.App. 4th Cir.1991), writ denied, 590 So.2d 63 (La.1991).
In State v. Banks, 446 So.2d 497 (La.App. 4th Cir.1984), this court applied the standards of the Jencks Act (18 U.S.C. Sec. 3500) to determine when and what a trial judge must examine during trial upon defendant's request for exculpatory witness statements. We stated:
The Jencks Act requires production of statements made by government witnesses even when incorporated in official investigatory reports. But it defines a discoverable "statement" as "a written statement made by said witness and signed or otherwise adopted by him." 18 U.S.C. Sec. 3500(e)(1). A witness adopts a statement only when he approves as his own the investigating officer's summary, selections, and interpretations of the witnesses's oral statements. United States v. Scaglione, 446 F.2d 182 (5th Cir.1971). Approval by the witness must be comparable to signature of the written statement, and discussions between the officer and the witness of the general substance of what the witness said does not mean the witness has adopted the statement. Moreover, a witness does not adopt a statement when the person taking the statement does not read it to the witness or when the witness does not read what the officer has written. Goldberg v. United States, 425 U.S. 94, 96 S.Ct. 1338, 47 L.Ed.2d 603 (1976).
On the other hand, a memorandum of an interview with a government witness which is not adopted by the witness is discoverable where it is a "substantially verbatim recital" of the witness's words and does not contain comments, impressions or opinions of the investigating officer. However, there is not a substantially verbatim recital merely because a report contains phrases or isolated sentences identical to language used by the witness. United States v. Cole, 634 F.2d 866 (5th Cir.1981). Generally, a police officer's investigative notes of a suspect's description are not a "substantially verbatim recital" of a witness' statement. *1099 March v. United States, 362 A.2d 691 (D.C.1976).
Id., 446 So.2d at 501.
The descriptions of the gunman contained in the initial police report and in subsequent police reports cannot be considered exculpatory evidence that could have been used to impeach Ms. Emberling's credibility.[4] Those reports did not contain any statements by Ms. Emberling that either were adopted by her or were a "substantially verbatim recital" of her words. The description of the gunman in the initial report was set forth in a checklist of physical characteristics and the description in the supplemental report was derived from her transcribed statement which we find to be the best evidence of what she actually said.
In the transcribed statement, Ms. Emberling described the gunman as 5'8" tall and weighing 185 or 190 pounds with a stocky build. She also said that he had a mustache which looked like that of a person who had not shaved in one or two weeks. At trial, she described the gunman as either 5'8" or 5'9" tall and weighing 180 pounds. She also testified that the assailant had a beard and mustache which looked as though he had not shaved in two or three weeks.
The difference between the description in Ms. Emberling's transcribed statement and the one in her trial testimony is slight; thus, there is not a reasonable probability that evidence of her transcribed statement to police would have changed the trial's outcome. This is also true of her grand jury testimony, in which her description of the perpetrator's height and weight was essentially the same as that given at trial except that she did not mention facial hair in her grand jury testimony. She was not asked about the presence of facial hair on the perpetrator when she was questioned before the grand jury; therefore, we cannot conclude that the failure to mention facial hair in her grand jury testimony was a contradiction which created a reasonable probability that the trial's outcome would have been changed had it been disclosed to the defense.
Defendant also argues that Ms. Emberling's grand jury testimony and the August 26, 1982 investigative report contained exculpatory evidence related to the identification of defendant made by Ms. Emberling when she was shown a photographic lineup by Detective Demma. Ms. Emberling testified before the grand jury that she did not make an immediate positive identification of defendant from the photographic lineup. She testified that she called the police later to tell them she was positive of her identification of defendant after focusing on the incident.
The report stated that after she chose defendant's picture from the lineup, Detective Demma asked her if she were positive that he was the one who shot Yeager. Ms. Emberling said that she was not sure and was very scared. The report further stated that she later called the detective to tell him that she was positive that defendant was the gunman and that her reason for initially stating that she was not sure was her fear that defendant knew where she lived and would try to kill her. At trial, neither Ms. Emberling nor Detective Demma testified about her initial hesitancy in identifying defendant in the photographic lineup.
Although there was no trial testimony that Ms. Emberling did not positively identify defendant at the time of the lineup, the failure of the State to disclose the August 26, 1982 report and grand jury testimony showing Ms. Emberling's initial hesitancy in identifying defendant is not reversible error. In both the report and the grand jury testimony, it was made clear that Ms. Emberling's initial reluctance to make an identification was resolved shortly after the lineup. It is not as though Ms. Emberling waited until trial to aver that she was positive defendant was the gunman.
Defendant argues that the initial report and the supplemental report of August, 1981 should have been disclosed to the defense because they contained the names of other witnesses whose testimony could have contradicted that of Ms. Emberling as to the *1100 description of the two assailants. The reports in question state that Martin Labord, Lionel Glasper, and Gregory Sumas heard gunshots and saw either one or two persons run from the scene. According to the report, Labord was inside his home when he heard two gunshots. Labord looked out of his window and saw two black males running on North Roman toward Kerlerec Street. He described one as being fifteen to sixteen years old with a stocky build, light skin, 5'7" tall and wearing cut-off shorts and a short sleeved shirt. He described the other as fifteen to sixteen years old with a slim build, dark complexion, 5'7" tall and wearing a multi-colored shirt and tan cut-off pants.
According to the report, Glasper told the police he was riding his bicycle on North Roman when he heard two gunshots and saw two black males running on North Roman toward Kerlerec Street. He stated that one of the males was wearing shorts. As to Sumas, the report stated that he was walking on North Roman when he heard two gunshots. He saw one black male, wearing a shirt and dark pants, standing over Yeager's body; but he did not see where this person went afterward. Sumas did not see a second black male.
We conclude that the failure of the State to disclose the names of these three witnesses to the defense does not constitute reversible error. None of these witnesses actually saw the shooting and only one of these witnesses, Labord, was able to give a detailed description of the perpetrators. Labord's description was not materially different from that given by Ms. Emberling, although the clothing descriptions differed. Even with this difference, there is not a reasonable probability that the outcome of the trial would have been different had the evidence been disclosed to the defense. Accordingly, this assignment of error is without merit.

ASSIGNMENTS OF ERROR NOS. 6, 8, 9, AND 10
In these assignments of error, defendant complains of various jury charges given by the trial court. In Assignment of Error No. 6, defendant complains of the charge in which the trial judge stated that an alibi defense relieved the State of its burden of proving defendant guilty beyond a reasonable doubt. In Assignment of Error No. 8, defendant argues that the reasonable doubt charge is the same as the one found to be unconstitutional in Cage v. Louisiana, 498 U.S. 39, 111 S.Ct. 328, 112 L.Ed.2d 339 (1990). In Assignment of Error No. 9, defendant complains that the jury charge on armed robbery was based on the 1983 amendment to R.S. 14:64 rather than the statute in effect in 1981. In Assignment of Error No. 10, defendant argues that the trial judge failed to instruct the jury on specific intent.
A review of the record shows that no objections were made to any of the jury charges. We do note, however, that defendant argues that a written objection was made to the reasonable doubt charge (which forms the basis for Assignment of Error No. 8). No such motion can be found in the record.[5] Therefore, appellate review of these errors is precluded. C.Cr.P. art. 801, 841; State v. Bourque, 622 So.2d 198 (La.1993); State v. Dobson, 578 So.2d 533 (La.App. 4th Cir.1991), writ denied, 588 So.2d 1110 (La. 1991).

ASSIGNMENT OF ERROR NO. 7
In his seventh assignment of error, defendant complains that the trial court violated C.Cr.P. art. 793 when it allowed the jury to have access to a newspaper article pertaining to the offense during their deliberations.[6] This argument was one of those *1101 found to have no merit by this court in supervisory writ 89-K-2116.[7] Additionally, a review of the minute entries for the trial shows that only the State objected to the trial judge's ruling allowing the jury to see the newspaper article that had been introduced into evidence. The defendant's failure to object to the viewing of this article by the jury precludes appellate review. C.Cr.P. art. 841. This assignment of error is without merit.

ASSIGNMENT OF ERROR NO. 11
In his eleventh and final assignment of error, the defendant complains that he received ineffective assistance of counsel at trial because his counsel failed to object to the jury charges on alibi, armed robbery, and specific intent and to Detective Demma's testimony concerning the anonymous tip. He claims that his counsel was also ineffective in failing to obtain the initial police report. These last two grounds were disposed of in defendant's prior writ application, 89-K-2116, where they were found to be without merit by this court; thus, they will not be reconsidered in this appeal.[8]
With regard to the ineffective assistance claims based on the failure to object to jury charges, such claims are ordinarily raised in applications for post-conviction relief; but, these claims can be addressed on appeal if the record contains the necessary evidence to evaluate the merits of the claims. State v. Seiss, 428 So.2d 444 (La.1983); State v. Kelly, 639 So.2d 888 (La.App. 4th Cir. 1994). There is sufficient evidence in the present case to evaluate these claims especially in light of the fact that defendant has already sought post-conviction relief in the present case.
Under Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), a defendant must show that his counsel's performance was deficient and that the deficient performance prejudiced him. With regard to counsel's performance, the defendant must show that counsel made errors so serious that counsel was not functioning as "counsel" guaranteed by the Sixth Amendment. As to prejudice, the defendant must show that counsel's errors were so serious as to deprive defendant of a fair trial, i.e. a trial whose result is reliable. Id., 466 U.S. at 687, 104 S.Ct. at 2064. Both showings must be made before it can be found that defendant's conviction resulted from a breakdown in the adversarial process that rendered the trial result unreliable. Id. A claim of ineffective assistance may be disposed of on the finding that either one of the two Strickland criteria has not been met. State v. James, 555 So.2d 519 (La.App. 4th Cir.1989), writ denied 559 So.2d 1374 (La.1990). If the claim fails to *1102 establish either prong, the reviewing court need not address the other. State ex rel. Murray v. Maggio, 736 F.2d 279 (5th Cir. 1984).
The test for determining the correctness of a jury instruction is whether, taking the instruction as a whole, reasonable persons of ordinary intelligence would understand the charge. State v. Bourque, 622 So.2d 198 (La.1993); State v. West, 568 So.2d 1019 (La.1990)
The trial judge charged the jury on alibi as follows:
An alibi is evidence which seeks to prove that the defendant, at the time the crime is charged to have been committed, was at another place and therefore, could not have committed the crime.
Hence, as a defense, it involves the impossibility of the defendant's presence at the scene of the offense at the time of its commission and the range of the evidence as to the time and place must be such as to reasonably exclude the possibility of such presence.
This, however relieves the State of its burden of proving the defendant's guilt beyond a reasonable doubt.
Evidence in connection with an alibi should be considered in connection with all the evidence in the case. If on the whole evidence there is reasonable doubt, it would be your duty to acquit the defendant.
Defendant argues that this charge relieved the State of its burden of proof and should have been objected to by defense counsel. Viewing this jury charge in the context of the entirety of the jury instructions, we do not find that defense counsel was deficient for failing to object to the alibi charge. The trial judge repeatedly told the jury that the State had to prove defendant's guilt beyond a reasonable doubt. The charge in question appears to be an awkward attempt by the trial judge to instruct the jury that if it believed the alibi defense, it was to acquit defendant because of what defendant had proven, not because the State failed to prove defendant's guilt beyond a reasonable doubt.
As to the instruction on armed robbery, defendant complains that his counsel should have objected when the instruction on armed robbery was based on the 1983 version of R.S. 14:64 instead of the statute in effect at the time of the offense in August, 1981. Although defendant is correct in his assertion that the jury was instructed as to the 1983 version of the armed robbery statute, we do not find that he was prejudiced by his counsel's failure to object. The 1983 version defines an armed robbery as a "taking" rather than as a "theft", as the pre-1983 version defined armed robbery. However, because the evidence overwhelmingly established that the defendant had the specific intent to kill while engaged in the perpetration of an attempted armed robbery under the stricter pre-1983 version of armed robbery requiring an intent to permanently deprive, the defendant suffered no prejudice from his counsel's failure to object to the instruction on armed robbery.
Defendant also complains that his counsel should have objected when the trial judge failed to define specific criminal intent. The trial judge instructed the jury that first degree murder was the killing of a human being when the offender had the specific intent to kill or inflict great bodily harm when the perpetrator was engaged in the perpetration or attempted perpetration of an armed robbery.[9] The judge further charged the jury as follows:
The law with reference to specific intent to kill or inflict great bodily harm is as follows:
First of all, the time element. The law knows no specific time within which an intent to kill or inflict great bodily harm must be formed so as to make the crime or the homicide murder. If the will of the person accompanies the act a moment antecedent to the act which causes the death, it will be completely sufficient to make the offense murder as if it were a day or any other time.

*1103 It is sufficient if there was a design or determination to kill or inflict great bodily harm formed in the mind of the slayer at any moment before or at the time of the slaying.
We do not find that defendant's counsel's failure to object to the specific intent charge rendered his counsel's assistance ineffective. The trial judge instructed the jury that first degree murder was a specific intent crime. Thus, there was no prejudice to defendant in his counsel's failure to object to that charge. Accordingly, this assignment of error is without merit.
For the reasons stated above, the defendant's conviction and sentence are affirmed.
AFFIRMED.
NOTES
[1] The facts in our earlier opinion in State v. Duncan, 517 So.2d 1270 (La.App. 4th Cir.1987), contained an error as to the date of this crime. The record reveals that the crime which is the subject of this appeal occurred on August 7, 1981.
[2] Officer Peterson testified that defendant was advised of his Miranda rights and signed a card on August 6, 1982 which stated that he understood his rights and was willing to make a statement. The defendant then responded to questions and made some spontaneous statements to Officer Peterson and Officer Pat Reed. Therefore, the statements of August 6, 1982 were correctly admitted into evidence.
[3] The record is unclear as to whether defendant gave a statement on August 23, 1982 or August 26, 1982. Detective Marco Demma's testimony refers to a statement on August 23, 1982 but defense counsel filed a motion to suppress a statement dated August 26, 1982. In defendant's original appeal, this court assumed that defendant was actually complaining about a statement made on August 26, 1982.
[4] This case was tried prior to the decision in State v. Shropshire, 471 So.2d 707 (La.1985), which held that the incident report was a public record which must be produced for the defendant's examination.
[5] During oral argument, we requested defense counsel to find the written objection in the record because, after thorough review, we were unable to. A few days later, defense counsel supplemented the record with copies of pleadings styled "Objection to Jury Charge and Requested Jury Charge." However, these copies were not marked "Filed" by the district court, nor are they dated.
[6] C.Cr.P. art. 793 provides:

A juror must rely upon his memory in reaching a verdict. He shall not be permitted to refer to notes or to have access to any written evidence. Testimony shall not be repeated to the jury. Upon the request of a juror and in the discretion of the court, the jury may take with it or have sent to it any object or document received in evidence when a physical examination thereof is required to enable the jury to arrive at a verdict.
[7] The record shows that the newspaper article in question was introduced into evidence by the defense in an effort to show that defendant had an independent source of knowledge as to the particulars of the crime which would explain a statement made by him during an interrogation in Oregon. Because the article was introduced by the defense for the purpose of making the jury aware of the contents, any undue weight that the contents might have had would be to the benefit of the defense and, therefore, harmless error.
[8] Our review of the previous writ disposition and the information supporting it is as follows:

Detective Demma testified that a confidential informant told him that defendant was the person who fatally shot the victim. This evidence was merely cumulative because an eyewitness identified the defendant as the perpetrator. Erroneously admitted testimony that is merely cumulative or corroborative is considered harmless beyond a reasonable doubt. State v. Spell, 399 So.2d 551 (La.1981).
Defendant's claim that his trial counsel was ineffective in failing to obtain the initial police report is based on his allegation that the report contained a statement from the key witness, Kristie Emberling, which differed from her testimony at trial. The statement of that witness was not, standing alone, exculpatory and, therefore, was not discoverable as Brady material. Additionally, defendant's trial was held in January, 1985 and initial police reports were not routinely given to defense attorneys on request until after State v. Shropshire, 471 So.2d 707 (La.1985), which was decided on June 17, 1985 with rehearing denied on September 9, 1985. Even if the defense attorney had a copy of the police report at trial, it is unlikely that the eyewitness could have been successfully impeached as her trial testimony was more detailed and was not in direct contradiction of her earlier statement.
[9] A review of the jury instruction transcript shows that the word "intent" is missing.