688 So.2d 643 (1997)
STATE of Louisiana, Appellee,
v.
Thomas E. PRINCE, Appellant.
No. 29208-KA.
Court of Appeal of Louisiana, Second Circuit.
January 24, 1997.
Rehearing Denied February 20, 1997.
*647 Bobby L. Culpepper, Jonesboro, for Appellant.
Richard Ieyoub, Attorney General, Walter E. May, Jr., District Attorney, James R. Hatch, Assistant District Attorney, for appellee.
Before HIGHTOWER, GASKINS and CARAWAY, JJ.
GASKINS, Judge.
The defendant, Thomas E. Prince, was indicted for three counts of attempted first degree murder, one count of second degree kidnapping, and one count of aggravated rape. A jury returned responsive verdicts of guilty to three counts of attempted manslaughter, guilty of second degree kidnapping, and not guilty of aggravated rape. After reviewing a pre-sentencing investigative (PSI) report, the trial court sentenced the defendant to 10 years for each count of attempted manslaughter, and 20 years for the second degree kidnapping, with two years to be served without benefit of probation, parole, or suspension of sentence. All the sentences were to be served concurrently. The defendant appealed. For the reasons set forth below, we affirm the defendant's convictions and sentences.

FACTS
In June of 1994, the defendant and his wife, Donna Prince, were experiencing martial problems. Approximately three days before this incident, Mrs. Prince moved out of the family home with two of their three children and went to live with Georgia Hancock.[1] Angel and Danny Evans and their children were also staying with Ms. Hancock at the time.
On June 12, 1994, between noon and 2:00 p.m., the defendant arrived at the Hancock residence uninvited. The Homer Police Department was called, and they asked the defendant to leave. He left without incident.
Later that night, at about midnight, the defendant returned to the Hancock residence. He kicked in the carport door and fired three shots with an assault rifle. Mr. and Mrs. Evans, as well as Ms. Hancock, were all wounded. The defendant forcibly grabbed Mrs. Prince and dragged her out of the house. When she begged him to stop and talk, the defendant responded that it was too late for begging. He told her that he had shot three people and that one more wasn't going to make a difference. The defendant continued to drag Mrs. Prince along the driveway and down the road to where he had parked his truck. He forced her into the truck and started driving. He placed the assault rifle on her lap, keeping one hand on the gun and one hand on the wheel of the truck. (In addition to the assault rifle, Mrs. Prince also observed a shotgun on the floorboard.) As they drove away from the residence, the defendant commented to Mrs. Prince about the "slug" he put in Mr. Evans' shoulder. He also told Mrs. Prince that he was going to shoot her and then shoot himself.
The defendant drove to the woods outside of Homer, Louisiana, and parked off of an old sawmill road. At this point, the defendant dragged Mrs. Prince out of the truck. He *648 then began to cry. After some conversation, the defendant pulled Mrs. Prince around to the passenger side of the truck and told her they were going to have sex one last time. Mrs. Prince initially protested. However, believing that the defendant was going to kill her and that further resistance would be useless, she ceased her protestations. The defendant then forced her to have sex with him.
After having sex, the defendant told Mrs. Prince to drive to town, get the children, and borrow some money so that they could all leave the state. She left him in the woods, drove to town, and immediately went to the sheriff's office.
Already alerted to the shootings and the abduction, local law enforcement officers were meeting at the sheriff's office to coordinate their search for the defendant and Mrs. Prince. Several officers testified that Mrs. Prince arrived at the sheriff's office bruised, disheveled, and hysterical. One of the officers took Mrs. Prince to the hospital while other officers went to the location in the woods described by Mrs. Prince.
The officers set up road blocks and searched the woods for the defendant. After some time, the defendant walked toward a road block, knelt down in the road, and placed a shotgun to his chin. The officers talked with the defendant and told him that he had not killed anyone. At first, he refused to believe the officers, insisting that he was a "better shot" than that. He eventually surrendered, and the officers arrested him. He led them to the assault rifle he used in the shootings. Near this location, the officers also observed the words "forgive me" written in the dirt road.
Prior to going to the wooded location, Deputy John Drew went to the home of the defendant's mother to see if he was there. The defendant's mother gave the deputy a note written by the defendant. The defendant and the state stipulated that the note was found by the defendant's mother and was written by the defendant. The note was addressed to "Girls" and was presumably for the defendant's three young daughters. It stated as follows:
Please forgive me for what will have happened when ya'll get back. I love ya'll + Mom more than anything. Please give Mother the chance to raise ya'll. Love forever, Dad
The defendant was indicted for three counts of attempted first degree murder, one count of second degree kidnapping, and one count of aggravated rape. The defendant pled not guilty and not guilty by reason of insanity. The trial court appointed a sanity commission. Based upon the reports of the examining doctors, the trial court found that the defendant had the capacity to proceed to trial.
After trial, the jury found the defendant guilty of three counts of attempted manslaughter and one count of second degree kidnapping. The jury acquitted the defendant of the rape charge. The defendant filed a motion for post verdict judgment of acquittal, a motion for a new trial, and a motion in arrest of judgment. The trial court denied each of these motions.
After reviewing the PSI report, the trial court sentenced the defendant to 10 years at hard labor for each count of attempted manslaughter, and 20 years for second degree kidnapping, two years of which to be served without benefit of parole, probation, or suspension of sentence. The trial court ordered the sentences to run concurrently. The trial court also ordered the defendant to pay restitution to the victims for their medical bills in the total amount of $5,005.41. The defendant made an oral motion to reconsider sentence which the trial court denied.
The defendant appealed. He asserted 14 assignments of error, four of which were not briefed on appeal. Assignments of error which are neither briefed nor argued are deemed abandoned. URCA Rule 2-12.4; State v. Schwartz, 354 So.2d 1332 (La.1978); State v. Kotwitz, 549 So.2d 351 (La.App. 2d Cir.1989), writs denied, 558 So.2d 1123 (La. 1990).

SUFFICIENCY OF EVIDENCE
In three assignments of error, the defendant contends that the trial court erred in denying his post trial motions, i.e., his motion *649 for post verdict judgment of acquittal, motion for new trial, and motion in arrest of judgment. In these assignments of error, the defendant essentially challenges the sufficiency of the evidence, maintaining that there was no evidence in the record upon which a rational juror could have decided that the defendant could distinguish between right and wrong at the time of the incident.
When issues are raised on appeal both as to the sufficiency of the evidence and as to one or more trial errors, the reviewing court should first determine the sufficiency of the evidence. The reason for reviewing sufficiency first is that the accused may be entitled to an acquittal under Hudson v. Louisiana, 450 U.S. 40, 101 S.Ct. 970, 67 L.Ed.2d 30 (1981), if a rational trier of fact, viewing the evidence in accord with Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), in the light most favorable to the prosecution, could not reasonably conclude that all of the elements of the offense have been proved beyond a reasonable doubt. State v. Hearold, 603 So.2d 731 (La. 1992).
In Louisiana, it is presumed that a defendant is sane at the time of the offenses. La. R.S. 15:432. The defendant has the burden of rebutting this presumption by proving the affirmative defense of insanity by a preponderance of the evidence. La.C.Cr.P. art. 652. Legal insanity is proved if the circumstances indicate that a mental disease or defect rendered the defendant incapable of distinguishing between right and wrong with reference to the conduct in question. La. R.S. 14:14.
The determination of sanity is a factual issue. All evidence, including expert testimony and lay testimony, along with the defendant's conduct and action, should be reserved for the fact finder to establish whether the defendant has proven by a preponderance of the evidence that he was insane at the time of the offense. State v. Silman, 95-0154 (La.11/27/95), 663 So.2d 27, 32. Lay testimony pertaining to the defendant's actions, both before and after the crime, may provide the fact finder with a rational basis for rejecting unanimous medical opinion that the defendant was legally insane at the time of the offense. State v. Claibon, 395 So.2d 770, 773-74 (La.1981); State v. Silman, supra.
In reviewing a claim of insufficiency of evidence in regard to a defense of insanity, a reviewing court applies the test set forth in Jackson v. Virginia, supra, to determine whether, viewing the evidence in the light most favorable to the state, any rational juror could have found that the defendant had not proven by a preponderance of the evidence that he was insane at the time of the offense. State v. Peters, 94-0283 (La.10/17/94), 643 So.2d 1222; and cases cited therein.
In the present case, Dr. Donald Haynes, a family doctor and a member of the court appointed sanity commission, examined the defendant. The defendant told Dr. Haynes that he could not remember entering Ms. Hancock's house, shooting the three victims, or leaving the residence but that he had no doubt that he did it. Dr. Haynes testified that he could not make a determination as to the defendant's sanity at the time of the offenses because he did not have enough information concerning the facts of the case. Dr. Haynes did not review the sheriff's reports in his evaluation of the defendant.
Dr. Haynes did comment that some of the factors he would have considered would have been whether the defendant was able to drive properly and whether he was able to leave the scene and hide. Dr. Haynes stated that the fact that a person is able to leave the scene and hide indicates that the person understood what he was doing.
The other member of the appointed sanity commission was Dr. Norman Mauroner, a psychiatrist. He testified that it was his opinion that the defendant could not distinguish between right and wrong at the time of the shootings but that he became conscious of his actions when he was in the truck with his wife driving away from the scene of the shootings. Dr. Mauroner testified that the defendant was not experiencing a "psychotic episode" rather it was an "altered state of consciousness" or a "dissociative reaction.".
The defendant told Dr. Mauroner that on his way to pick up his wife he passed the *650 cemetery where his father was buried and he made the statement to his father that he would be joining him soon. According to Dr. Mauroner, the defendant anticipated committing suicide. The defendant then told Dr. Mauroner that he did not remember anything that happened between the time he passed the cemetery and the time he was in the truck with his wife.
In reaching the conclusion that the defendant could not distinguish between right and wrong at the time of the shootings, Dr. Mauroner considered the length of the defendant's relationship with his wife, 22 years, and the fact that his family was dissolving. He also considered that the defendant did not retrieve his children as he had planned and that the defendant entered the house and immediately started shooting without any discussion, in addition to the defendant's erratic behavior throughout the incident. However, he conceded that a person with a true dissociative reaction would not have a specific, detailed memory of the events.
Dr. Aris Cox, a psychiatrist, was asked by the state to evaluate the defendant. Dr. Cox agreed with Dr. Mauroner's conclusion that the defendant could not distinguish between right and wrong at the time of the shootings and that he regained conscious awareness at some point in the truck with his wife. Dr. Cox's opinion was that the defendant was amnesic for part of the time and he became psychotic in that he felt he had to rescue his children. Dr. Cox did admit that this was a very unusual case in that the defendant had never experienced psychotic episodes before this incident and had no history of mental illness.
As stated above, lay testimony concerning the defendant's actions, before and after the crime, may provide the jury with a rational basis for rejecting the expert's opinion that the defendant was legally insane at the time of the offenses. In the present case, there are several factors which the jury could have considered in determining that the defendant knew right from wrong at the time of the shootings.
First, the defendant gathered ammunition and weapons before proceeding to Ms. Hancock's house in the middle of the night. The defendant had been there previously. The afternoon before the shooting he had been asked to leave by the police. Mrs. Evans had attempted to talk to him when he came to the Hancock residence demanding to see his wife. Thus, it can be assumed that the defendant was aware Mr. and Mrs. Evans were also staying at Ms. Hancock's and that he would meet some resistance upon his return.
Second, the defendant entered the home without warning and began shooting immediately. However, even though all of the victims were in the same room, he did not shoot his wife. Although Dr. Mauroner considered this a factor indicating insanity, a rational juror could also see the defendant's actions as a calculated plan to abduct his wife and to shoot anyone who got in his way.
Third, the defendant made several comments during the commission of the offenses that could be considered as evidence of his sanity. While the defendant was dragging his wife away from the scene of the shooting, he made the comment that he had already shot three people and that one more would not make a difference. In the truck while fleeing the scene, the defendant asked Mrs. Prince if she had seen the "slug that I put in Danny's shoulder." Also, at the time of his surrender, the defendant refused to believe that he had not killed the three victims because, as he stated, he was a better shot than that. These comments contradict Dr. Cox's theory that the defendant was amnesic at the time of the shooting. They also contradict the statements made by the defendant to all three doctors that he had no memory of entering the house, shooting the three victims, or leaving the house. Not only did the defendant remember shooting Danny Evans, he was aware of the general area in which he shot Mr. Evans.[2]
Fourth, the defendant fled with his wife to a remote area. Mrs. Prince testified that they used to collect sawdust along the road upon which they eventually stopped. This *651 indicated that the defendant planned his escape and knew where he was going.
Fifth, the note was also evidence that the defendant planned to abduct his wife and commit an act that required the children's forgiveness. Dr. Mauroner considered as a factor indicating insanity the fact that the defendant did not retrieve his children from the home as was his plan. However, it appears that this was not the defendant's actual plan. Only the youngest child was at Ms. Hancock's when the defendant broke in; the older two girls were staying with the defendant that evening. (The oldest daughter was apparently home from college that weekend.) The note left for the "girls" does not indicate that, in addition to his wife, he planned to abduct any of the children. It does, however, corroborate the defendant's declaration to his wife that he intended to kill her, then himself.
Sixth, when the officers were searching the area in the woods, the defendant hid in a ditch. This indicated a guilty knowledge and an awareness of the difference between right and wrong. The defendant also wrote "forgive me" in the dirt road which demonstrated that he was aware that he had shot three people and thought he had killed them.
Finally, the defendant had no history of psychotic episodes or mental illness. He was not treated for any mental illness after the offenses and was judged capable of proceeding to trial by all three doctors.
We find that the lay testimony concerning the events surrounding the offenses was sufficient to provide a rational basis for the jury to reject the experts' conclusions that the defendant was insane at the time of the offenses. See State v. Silman, supra.
These assignments of error are without merit.

CHALLENGE FOR CAUSE
The defendant contends that the trial court erred in granting the state's challenge for cause to prospective juror Walter Henderson.
During the trial court's questioning of the prospective jurors, Mr. Henderson admitted that he had been incarcerated in the State of Arkansas in 1978. Mr. Henderson stated that he had not received a pardon and that he had served his time. The state challenged Mr. Henderson for cause based on the fact that he had been convicted of a crime. The defendant objected to this challenge as the record did not show whether Mr. Henderson was convicted of a misdemeanor or a felony. The trial court granted the state's challenge for cause.
The erroneous granting of a challenge for cause to a prospective juror is not reversible error unless the effect of the ruling is to allow the state more peremptory challenges than the law provides. La.C.Cr.P. art. 800; State v. Vergo, 594 So.2d 1360 (La.App. 2d Cir.1992), writ denied, 598 So.2d 373 (La. 1992). The state exercised only one peremptory challenge during the selection of the jury and one during the selection of the alternate juror. Thus, even if the prospective juror was erroneously dismissed for cause, the defendant has no basis for complaint.
This assignment of error has no merit.

ADMISSION OF PHOTOGRAPHS OF KIDNAPPING VICTIM
In his next assignment of error, the defendant claims that the trial court erred in allowing into evidence certain photographs of the defendant's wife. The state introduced six photographs of Mrs. Prince showing the injuries she sustained during the offenses. The defendant objected to the introduction of all six photos, arguing that one photo would be sufficient to show Mrs. Prince's injuries. The trial court ruled that the photos were not particularly gruesome or prejudicial and that one photograph would not be particularly illustrative. The trial court admitted all of the photographs into evidence.
Photographs are generally admissible if they illustrate any fact, shed any light upon an issue in the case, or are relevant to describe the person, thing or place depicted. State v. Valentine, 364 So.2d 595 (La.1978); State v. Beason, 26725 (La.App.2d Cir. 4/7/95), 653 So.2d 1274, writ denied, 95-1388 (La.10/27/95), 661 So.2d 1359. The photographs in question were relevant to prove the *652 forcible seizing element of second degree kidnapping. The photographs were not gruesome, and they were not repetitious. Five of the photos were close-up pictures of Mrs. Prince's injuries to her various body parts, and one photo was a full length picture of Mrs. Prince. The trial court did not abuse its discretion in finding that one photograph was not particularly illustrative and that all the photos were relevant.
This assignment of error is without merit.

ADMISSION OF SHERIFF'S RADIO LOG
In this assignment of error, the defendant complains that the trial court erred in allowing the admission of the dispatcher's log showing the time the sheriff's office was first notified of the offenses and the time the defendant was apprehended. At trial, the defendant offered to stipulate to the time frame of the offenses. According to the defendant, the evidence pertaining to the log "merely confused the issues and wasted the time of the [c]ourt."
Relevant evidence is evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. La. C.E. art. 401. Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or waste of time. La. C.E. art. 403.
The sheriff's dispatcher logs were relevant to show the time frame of the offenses in question. The testimony concerning the logs did not confuse the issues nor did it consume an inordinate amount of time. The trial court did not abuse its discretion in allowing the admission of the logs or of the testimony concerning the logs.
This assignment of error is without merit.

DEFENDANT'S STATEMENTS TO MEMBER OF SANITY COMMISSION
The defendant maintains that the trial court erred in allowing Dr. Donald Haynes, a member of the sanity commission appointed to examine the defendant, to testify as to statements made to him by the defendant. The statements concerned the defendant's recollection of the offenses. The defendant argued that this testimony violated the health care provider-patient privilege as set forth in La. C.E. art. 510 (formerly La. R.S. 15:476).
Article 510(C) provides that in criminal proceedings, a patient has a privilege to refuse to disclose or to prevent another person from disclosing a confidential communication made for the purpose of advice, diagnosis or treatment of his health condition between or among himself, his representative, and his physician or psychotherapist, and their representatives. An exception to this rule is when the communication was made in the course of an examination ordered by the court in a criminal case to determine the health condition of a patient. La. C.E. art. 510(C)(2)(c). The defendant contended that, since Dr. Haynes testified that he was unable to determine the defendant's mental status at the time of the shootings, the statements made by the defendant during the examination should not fall under the above quoted exception and should have been excluded.
The health care provider-patient privilege does not apply to court appointed physicians. State v. Felde, 422 So.2d 370 (La.1982), cert. denied, 461 U.S. 918, 103 S.Ct. 1903, 77 L.Ed.2d 290 (1983). An implied waiver of the health care provider-patient privilege exists in cases where the defendant enters a plea of not guilty by reason of insanity. State v. Berry, 324 So.2d 822 (La.1975), cert. denied, 425 U.S. 954, 96 S.Ct. 1731, 48 L.Ed.2d 198 (1976); State v. Brown, 619 So.2d 692 (La.App. 4th Cir.1993).
In the present case, the defendant waived his privilege when he pled not guilty by reason of insanity. Dr. Haynes was ordered by the court to examine the defendant and to determine his mental status at the time of the offense. Dr. Haynes' recitation of the defendant's recollection of the incident was relevant to the issue of whether the defendant was able to distinguish right from *653 wrong at the time of the offense. We find that the trial court did not err is allowing this testimony.
This assignment of error is without merit.

WRITING ON THE GROUND
In his testimony, Deputy Steve Williams testified as to his impression of what was written on the ground near the area where the defendant's assault's rifle was recovered. The defendant argues that the trial court erred in allowing this testimony.
Deputy Williams testified that near the area in which they found the rifle, the words "forgive me" were written in the dirt. The defendant objected to Deputy Williams testifying as to what was written in the dirt as a picture of the site was introduced into evidence, asserting that the jury could draw its own conclusions from the photograph. On appeal, the state argues that the photograph was difficult to read and Deputy Williams' testimony was thus necessary.
We find that the trial court did not abuse its discretion in allowing Deputy Williams to testify as to what he saw written in the dirt. The copy of the picture reviewed by this court is completely illegible. The jury could properly weigh the picture and the testimony as it deemed fit.
This assignment of error is without merit.

JURY INSTRUCTIONS
In his next assignment of error, the defendant asserts that the trial court erred in giving incorrect jury instructions and in refusing to give specific jury instructions requested by the defendant.

Requested Jury Instructions
The defendant requested 26 special jury charges. Of these requested charges, almost one-half of them were either added to the charges by the trial court or were already included in the general charges. On appeal, the defendant alleges that the trial court erred in failing to give the following special jury charges:
2) If the expert testimony in this matter from the psychiatrist establishes that defendant did not know the difference between right and wrong at the time of the alleged crime or crimes, you should vote not guilty.
7) You may consider the fact that the state presented no testimony to rebut or contradict the testimony of Dr. Cox and Dr. Mauroner.
9) The fact that the defendant made no attempt to hide the alleged weapon is a factor tending to show that he was unable to distinguish between right and wrong.
10) You may consider whether or not the defendant acted "normal" immediately prior to the incident in question in determining sanity.
11) Once the defendant proves by a preponderance of the evidence that he did not know the difference between right and wrong at the time of the occurrence, the state has the burden of proving, beyond a reasonable doubt, by competent evidence, that the defendant was, in fact, sane.
12) In determining sanity in this matter, you may consider the fact that both the psychiatrists were of the opinion that defendant could not distinguish between right and wrong at the time of the alleged offense.
13) Even where some expert witnesses testify that a defendant could not distinguish between right and wrong at the time of the alleged crime and other experts testify that the defendant could, the defendant can still be found not guilty by reason of insanity.
14) You may consider the fact that defendant had no memory or only sketchy memory during the time frame in question as evidence of defendant's inability to distinguish between right and wrong.
15) You may consider the fact that the defendant "went wild," broke into the house, and fired shots, if that is supported by the evidence, as a factor establishing insanity
18) If the defendant did not have a specific intent to kill the alleged victim, he cannot be convicted of a lesser included responsive crime.

*654 21) You cannot convict the defendant of attempted first degree murder of any of the alleged victims by utilizing any of the other counts or charges against the defendant as the underlying felony (all citations omitted).
A requested special jury charge shall be given by the court if it does not require qualification, limitation, or explanation, and if it is wholly correct and pertinent. It need not be given if it is included in the general charge or in another special charge to be given. La.C.Cr.P. art. 807. Failure to give a special charge to the jury constitutes reversible error only when there is a miscarriage of justice, prejudice to substantial rights of the defendant, or a violation of a constitutional or statutory right. State v. Edwards, 25963 (La.App.2d Cir. 5/4/94), 637 So.2d 600.
The defendant did not address each individual requested charge. Instead, he simply asserted that none of the requested jury instructions required any qualifications, limitations, or explanation as stated by the jurisprudence and were not included in the general charge. Thus, the defendant concluded that the trial court erred in failing to give the requested charges.
First, requested jury instructions numbers two and eleven are inaccurate and would require further explanation. The trial court properly instructed the jury that the defendant carries the burden of proving insanity by a preponderance of the evidence and that the jury was to consider all the evidence, including the expert and lay testimony, in determining this issue.
Second, requested jury instructions numbers seven, nine, fourteen and fifteen are essentially conclusive comments on the evidence. The requested charges imply that certain facts are true. The jury is responsible for the determination of the facts in question. It is not proper for the trial court to comment on the evidence or to imply what the evidence may have proven. See La. C.Cr.P. art. 772. Furthermore, appropriate instructions on these issues were included in the general charge. The trial court properly instructed the jury that they were to consider all the testimony, including the expert and lay testimony, and the conduct and actions of the defendant.
Third, requested jury instructions numbers ten, twelve, thirteen, and eighteen were also included in the trial court's general charge. As discussed above, the trial court instructed the jury to consider all the evidence presented in determining the issue of the defendant's sanity. The trial court also properly instructed the jury concerning the necessary intent required to convict the defendant of the responsive verdicts.

Double jeopardy
Requested jury instruction number twenty-one asserts that it is a violation of double jeopardy to charge the defendant with three counts of first degree murder when the basis of the first degree murder is the intent to kill or inflict great bodily injury upon more than one person. The defendant argues that when proof of the commission of a felony is an essential element of a first degree murder or an attempted first degree murder, the defendant cannot be convicted and punished for both the murder and the underlying felony. State v. Lee, 554 So.2d 180 (La.App. 2d Cir.1989). While we believe that it would have been more appropriate to raise this argument on a motion to quash under La. C.Cr.P. art. 532, we nonetheless consider it.
The fourth and fifth circuits have already addressed this double jeopardy issue. See State v. Wilson, 538 So.2d 1124 (La.App. 5th Cir.1989); and State v. Gerrel, 499 So.2d 381 (La.App. 4th Cir.1986), writ denied, 515 So.2d 1106 (La.1987). These cases held that charging a defendant for two counts of first degree murder with the underlying offense being the other murder or attempted murder did not violate the principles of double jeopardy. The courts reasoned that the elements required to prove first degree murder are 1) the killing of a human being and 2) the specific intent to kill or inflict great bodily harm on another person. Thus, it is not required that the state prove that the defendant killed or inflicted great bodily harm upon the second victim, only that he had the specific intent to do so. Therefore, these charges pass the "same elements" test or the *655 Blockburger test for double jeopardy. State v. Steele, 387 So.2d 1175 (La.1980); Blockburger v. United States, 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1982).
The trial court did not err in finding that the three charges of attempted first degree murder did not violate the principles of double jeopardy.

Criminal Intent
In discussing criminal intent, the trial court instructed the jury "[y]ou may infer that the defendant intended the natural and probable consequences of his act." The defendant asserts that this instruction violated the due process clause as interpreted by Sandstrom v. Montana, 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979). In Sandstrom, the Supreme Court held that an instruction that "the law presumes that a person intends the ordinary consequences of his voluntary acts" violates the due process clause of the 14th Amendment. The Supreme Court found that this instruction could have the effect of impermissibly shifting the burden of proving intent to the defendant or creating a conclusive presumption of intent against the defendant. See State v. Heads, 385 So.2d 230 (La.1980).
Instructions identical to those in the present case have been approved in recent Louisiana Supreme Court cases. See State v. Tart, 93-0772 (La.2/9/96), 672 So.2d 116, and State v. Mitchell, 94-2078 (La.5/21/96), 674 So.2d 250.
This assignment of error is without merit.

EXCESSIVE SENTENCE
In his final assignment of error, the defendant claims that the trial court imposed excessive and unconstitutional sentences.
Attempted manslaughter carries a potential sentence of 20 years. La. R.S. 14:31 and 14:27. Second degree kidnapping carries a minimum sentence of five years and a maximum sentence of 40 years; at least two years of the sentence must be imposed without benefit of parole, probation or suspension of sentence. La. R.S. 14:44.1. The trial court sentenced the defendant to 10 years on each count of attempted manslaughter and to 20 years for the second degree kidnapping, two years without benefit, all to run concurrently to each other. The trial court also ordered the defendant to pay a total amount of $5,005.41 as restitution to the victims.
The test imposed by the reviewing court in determining the excessiveness of a sentence is two-pronged. First, the record must show that the trial court took cognizance of the criteria set forth in La.C.Cr.P. art. 894.1. The trial judge is not required to list every aggravating or mitigating circumstance so long as the record reflects that he adequately considered the guidelines of the article. State v. Smith, 433 So.2d 688 (La. 1983); State v. Gene, 587 So.2d 18, 24 (La. App. 2d Cir.1991), writ denied, 604 So.2d 993 (La.1992).
The articulation of the factual basis for a sentence is the goal of La.C.Cr.P. art. 894.1, not rigid or mechanical compliance with its provisions. Where the record clearly shows an adequate factual basis for the sentence imposed, remand is unnecessary even where there has not been full compliance with La.C.Cr.P. art. 894.1. State v. Lanclos, 419 So.2d 475 (La.1982). The important elements which should be considered are the defendant's personal history (age, family ties, marital status, health, employment record), prior criminal record, seriousness of offense, and the likelihood of rehabilitation. State v. Gene, supra.
At sentencing, the trial court considered the defendant's education, work history, the impact of the crimes on the victims, and his prior incident of assaultive behavior.[3] The court considered the fact that the crimes were committed with a dangerous weapon and that the defendant created a risk of great bodily harm not only to the victims but also to three children who were in the residence at the time of the shooting. The court also considered mitigating factors such as the psychiatric testimony that the defendant did not know right from wrong at the time of the offenses, the fact that the defendant's estranged wife contributed to the defendant's *656 mental state by her consistent history of leaving him, and, except for the single incident involving his sister, the fact that the defendant had no history of prior criminal activity. Finally, the court considered the hardship the defendant's incarceration would impose upon his family as he financially supported them. The trial court more than adequately complied with La.C.Cr.P. art. 894.1 by stating a complete and thorough factual basis for the defendant's sentence.
On appeal, the defendant argued that the trial court erred in considering certain aggravating factors and in failing to consider some mitigating factors. The defendant argues that the three victims of the attempted manslaughter received non-life threatening injuries, that the victim of the second degree kidnapping was the defendant's wife, and that the court improperly considered the fact that there were three children in the house at the time of the shooting. The defendant asserts that there was no evidence that these children were in danger. As mitigating factors, the defendant asserts that he acted under strong provocation; that there was "substantial grounds to excuse or justify his criminal conduct"; that his criminal conduct was the result of his wife leaving him; that he has no previous criminal history except for the incident involving his sister; that he would be likely to respond affirmatively to probationary treatment; and that imprisonment would entail excessive hardship on himself and his three daughters.
First, it is evident that the trial court considered the attempted manslaughter victims' injuries in imposing sentences in the lower range of possible sentences. Second, the fact that the victim of the kidnapping was the defendant's wife does not mitigate the seriousness of the crime. Furthermore, the evidence does not show that the defendant acted under strong provocation; the fact that his wife left him was not "substantial grounds" to justify or excuse the defendant's shooting three innocent bystanders and kidnapping his wife by force. Third, as to the three children in the residence at the time of the shootings, when the defendant burst into the residence and began firing immediately, he could not have known whether or not the children were in the same room with the adults. Finally, the trial court duly considered the defendant's lack of criminal history and the fact that his incarceration would present a hardship to his family.
The next step in determining the excessiveness of a sentence is to determine whether the sentence is constitutionally excessive considering the circumstances of the case and the background of the defendant. A sentence violates La. Const. art. 1, § 20 (1974) if it is grossly out of proportion to the seriousness of the offense or nothing more than a purposeless and needless infliction of pain and suffering. State v. Dorthey, 623 So.2d 1276 (La.1993); State v. Gene, supra. A sentence is considered grossly disproportionate if, when the crime and punishment are considered in light of the harm done to society, it is so disproportionate as to shock the sense of justice. State v. Hogan, 480 So.2d 288 (La.1985); State v. Thompson, 25583 (La.App.2d Cir. 1/19/94), 631 So.2d 555, and cases cited therein. The trial judge has wide discretion in the imposition of a sentence within the statutory limits and such a sentence should not be set aside as excessive absent a manifest abuse of discretion. State v. Thompson, supra.
We find that the sentences imposed by the trial court are not unconstitutionally excessive. To the contrary, given the seriousness of the crimes and the multiple victims, the trial court was somewhat lenient. The defendant was potentially exposed to a total of 60 years for the three attempted manslaughter convictions and 40 years for the second degree kidnapping. Under the circumstances of this case, a total sentence of twenty years was not an abuse of the trial court's discretion and does not shock the sense of justice.
This assignment of error had no merit.

CONCLUSION
For the reasons assigned above, we affirm the convictions and sentences of the defendant.
AFFIRMED.
NOTES
[1] The eldest child was away at college.
[2] Mr. Evans testified that he was wounded in the arm.
[3] According to the PSI report, in 1986 the defendant was arrested for grabbing his sister by the hair, pointing a pistol to her head, and threatening to shoot her if she did not get into a car with him. The charges were later dismissed.