702 So.2d 744 (1997)
STATE of Louisiana, Appellee,
v.
Steve BROWN, Appellant.
No. 29708-KA.
Court of Appeal of Louisiana, Second Circuit.
September 24, 1997.
*746 John M. Lawrence, Shreveport, for Appellant.
Richard Ieyoub, Attorney General, Jerry L. Jones, District Attorney, J. Michael Ruddick, Assistant District Attorney, for Appellee.
Before HIGHTOWER, WILLIAMS and STEWART, JJ.
STEWART, Judge.
The defendant, Steve Brown, was charged with one count of second degree murder. The jury, with a unanimous verdict, found the defendant guilty as charged. The trial court imposed a sentence of life imprisonment without benefit of parole, probation or suspension of sentence. Defendant appeals, urging ten assignments of error. We affirm.

FACTS
The defendant and his former girlfriend, Shannon Smith (now Young), had known *747 each other since they were children. Smith's grandmother lived across the street from the Brown family in Monroe. Smith testified that she and the defendant became romantically involved in July of 1993.
Shannon Smith and her mother, Betty Wallace, lived together at Ms. Wallace's residence on 1801 Renaud Street, Monroe, Louisiana. Also living at the residence was Ms. Smith's three-year-old daughter, Sable. Smith testified that on the afternoon of November 27, 1993, the defendant called her and said that he wanted to talk to her. Smith refused to speak to the defendant and eventually turned the ringer off on her telephone because the defendant kept calling back.
Smith said that, later that evening, she, her mother and her daughter were inside their residence in Monroe when the defendant, Steve Brown, kicked down the front door. The defendant was armed with a Lorcin.380 caliber pistol. Smith's mother called 911 while Smith tried in vain to block the front door with furniture. The defendant shot Mrs. Wallace as she tried to run away. Mrs. Wallace died as a result of her wound.
Smith testified that the defendant told her that he was going to kill her and then kill himself. Smith said that she began to try to pacify the defendant in order to protect her daughter, telling him that she loved him and that they could be together as a family. The defendant made Smith drive her vehicle to the gas station. Smith testified that she and her daughter left their home with only the clothes that they were wearingand Smith was without shoesand that she did not have her glasses and could not see well without them. She said that she did not return to the defendant's trailer. However, her wallet and other belongings were later found there.
When they arrived at the gas station, the still-armed defendant told Smith that he would kill her and anyone else around if she tried to escape. She testified that the defendant had been drinking "a white liquid" like vodka and was intoxicated. Smith said that the defendant then drove them to Mississippi and, along the way, made her touch the gun, possibly in an effort to get her fingerprints on the weapon. When they reached Mississippi, Smith's car broke down. Smith testified that she did not try to escape at this point because she could not see well enough without her glasses to get away. Because the defendant was not able to find a place to repair the car, they all checked into a hotel.
Smith testified that the defendant raped her at gunpoint in the motel room. Sometime thereafter, the defendant left the room to talk to the tow truck driver, leaving the gun behind. Smith then took the gun and her daughter to the hotel lobby and summoned the police.
On Sunday, November 28, 1993, the police in Forrest, Mississippi were called to the Best Western Motel on Highway 35 South at 2:55 a.m. At the motel, they found Smith inside the office area with the door locked. Outside the door was defendant, Steve Brown. Smith told police that defendant had broken into her home at 1801 Renaud Street in Monroe, Louisiana shot her mother to death, kidnaped her, and raped her inside the motel. The Mississippi Police recovered a .380 Lorcin semi-automatic pistol.
The Mississippi police advised the Monroe Police that they had received a complaint from Shannon Smith of an apparent homicide at 1801 Renaud Street, Monroe, Louisiana. Upon verifying with the Monroe Police Department that there had been a homicide at the Renaud Street address, the defendant was held by the Mississippi police and ultimately arrested and returned to Louisiana.
The Mississippi motel manager testified that Smith had returned to the lobby "screaming and hollering" "he killed my mother" about 30 minutes after she checked in. She also corroborated Smith's testimony that she and her daughter were underdressed for the cold November night. The police officer who responded to the call testified that he arrested the defendant for public intoxication and took the gun as evidence. He also took a statement from Smith which gives essentially the same story as she told at trial. Another police officer testified that the defendant told him that Smith had taken the gun from him.
*748 A Monroe police detective described the murder scene in great detail. This detective located the spent bullet which killed the victim. The forensic pathologist who performed the autopsy on Mrs. Wallace testified that the victim died as a result of the gunshot wound.
The defendant was charged with the second degree murder of Betty Wallace. Based upon the facts and testimony, the jury unanimously found the defendant guilty as charged of second degree murder. The defendant was sentenced to life imprisonment without benefit of probation, parole or suspension of sentence.

SUFFICIENCY OF THE EVIDENCE
In assignment of error number five, the defendant argues that the trial court should have granted his Post Verdict Motion of Acquittal. The defendant filed a pro se motion for a post-verdict judgment of acquittal, alleging inconsistencies in the physical evidence and in the testimony of Smith. The defendant chose not to present any arguments in support of the motion. The motion bears no written ruling but the court denied the motion in open court.
When issues are raised on appeal both as to the sufficiency of the evidence and as to one or more trial errors, the reviewing court should first determine the sufficiency of the evidence. The reason for reviewing sufficiency first is that the accused may be entitled to an acquittal under Hudson v. Louisiana, 450 U.S. 40, 101 S.Ct. 970, 67 L.Ed.2d 30 (1981), if a rational trier of fact, viewing the evidence in accord with Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), in the light most favorable to the prosecution, could not reasonably conclude that all of the elements of the offense have been proved beyond a reasonable doubt. State v. Prince, 29,208 (La.App.2d Cir. 01/24/97), 688 So.2d 643, 649.
Under Jackson v. Virginia, supra, the proper standard of appellate review for a sufficiency of evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. State v. Bellamy, 599 So.2d 326 (La. App. 2d Cir.1992), writ denied, 605 So.2d 1089 (La.1992); La.C.Cr.P. art. 821.
This court's authority to review questions of fact in a criminal case is limited to the sufficiency-of-the-evidence evaluation under Jackson v. Virginia, supra, and does not extend to credibility determinations made by the trier of fact. La. Const., art. 5, § 5(C); State v. Williams, 448 So.2d 753 (La.App. 2d Cir.1984). A reviewing court accords great deference to a jury's decision to accept or reject the testimony of a witness in whole or in part. State v. Rogers, 494 So.2d 1251 (La.App. 2d Cir.1986), writ denied, 499 So.2d 83 (1987).
The defendant asserts that the physical evidence in this case does not corroborate Smith's testimony implicating the defendant as the killer. In support of this argument, he urges that Smith had a motive to testify that the defendant shot her mother because she may have been involved in the murder herself. He also urges that the shell casing found underneath the victim's body was not matched to the defendant's gun and that the defendant's fingerprints were not found at the scene of the crime. The state asserts that the evidence is consistent with Smith's testimony and is sufficient to support the conviction.
Based upon the opening argument of defense counsel, the jury was fully aware of defendant's argument that Smith had a motive to lie about the defendant's involvement because she may have been involved herself. The defendant presented both physical and testimonial evidence tending to support this theory, and the jury rejected it in favor of Smith's testimony. This is purely a credibility decision which, in this case, is not contradicted by any physical evidence.
Although the defendant did not testify, defense counsel exhaustively cross-examined Smith and called several witnesses on the defendant's behalf. The defense argued that the cartridge case found underneath the victim's body could not be positively matched to his gun. Although the defendant correctly states that the cartridge case found underneath the victim's body could not be positively *749 matched to his gun, he fails to note that the cartridge case was not excluded as being one fired from his gun. An expert in the field of firearms identification testified that the cartridge case could not be eliminated because the general overall class characteristics meaning the size, shape and general markings that are characteristic of the weapon are there.
Much more importantly, the crime lab technician was able to positively match the recovered bullet which killed the victim to the defendant' gun. Another investigator showed the jury a comparison between the defendant's shoes and a shoeprint taken from Mrs. Wallace's front door; the impressions appeared to be similar or identical to the shoes the defendant was wearing. Coinciding with Smith's testimony that the defendant kicked in the door of her mother's house.
Because the jury's decision to credit Smith's testimony is uncontradicted by physical evidence and, indeed, is supported by that evidence, the defendant has failed to show that the evidence against him is insufficient to sustain his conviction.
This assignment of error is without merit.

MOTION FOR CHANGE OF VENUE AND MOTION TO SEQUESTER THE JURY
The defendant's assignment of errors number one and number two complain of the absence of a hearing or ruling on the defendant's motion for change of venue and defendant's motion to sequester the jury. On January 29, 1996, the defendant filed a motion for a change of venue based upon alleged pre-trial publicity and the attendant prejudice therefrom. Citing similar grounds, the defendant filed a motion to sequester the jury on the same day. However, the record reflects and the parties agree, neither of these motions was ever heard or ruled upon by the district court. The defendant asks this court to review the motions "on their face" for purposes of this appeal. The state asserts that the defendant is not entitled to review because of his failure to request a hearing or to object to a ruling of the trial court.
The defendant did not explicitly request a hearing on either of his motions, but both motions contain blank fill-in-the-blank orders to the state to show cause why the motions should not be granted.
As for the motion to sequester the jury, La.C.Cr.P. art. 791(C) provides:
In noncapital cases, the jury shall be sequestered after the court's charge and may be sequestered at any time upon order of the court.
Therefore, sequestration, before the trial court's charge, is required only in capital cases. The record is silent regarding the sequestration of the jurors, but the defendant made no objection to whatever procedure was followed. The article does not require a hearing. The trial court is not required to sequester the jury in noncapital, second degree murder prosecution.
The trial court admonished the jurors not to listen to or read any media accounts about the trial or discuss the case among themselves or with others. There is no showing that the jury disregarded the judge's instructions to avoid media reports or that the defendant was prejudiced. The defendant failed to object to the absence of a ruling on the motion, failed to object to whatever procedure was followed and failed to show that the jury disregarded the judge's instructions and thereby prejudiced the defense. The absence of a hearing or ruling on this motion does not present reversible error.
The defendant's assignment of error number one complains that the trial court erred in not holding a hearing or ruling on his motion for change of venue.
La.C.Cr.P. art. 621 provides:
A motion for a change of venue may be filed by either the state or the defendant. It shall be filed in accordance with Article 521; or thereafter, in the discretion of the court, any time before the first witness is sworn at the trial of the merits. The motion shall be in writing, sworn to by mover or his counsel, and shall contain:
(1) Allegations of fact upon which the motion is based; and

*750 (2) A statement that the motion is not made for the purpose of delay, but to obtain a fair and impartial trial. A contradictory hearing shall be held upon the motion.
This article indicates that the trial court shall hold a hearing on the motion. However, the use of that mandatory language does not dispose of the question. The record reveals no objection by the defendant to the failure of the court to hold a hearing or rule on the motion. The parties have cited no cases in this section of their briefs; a similar case is State v. Brogdon, 426 So.2d 158 (La. 1983), cert. denied 471 U.S. 1111, 105 S.Ct. 2345, 85 L.Ed.2d 862 (1985), rehearing denied 473 U.S. 921, 105 S.Ct. 3547, 87 L.Ed.2d 670 (1985). In that case, defendant made a motion for a change of venue; the trial court denied the motion without a hearing but reserved the defendant's right to reurge the motion during voir dire if a problem became apparent. The defendant did not object to this procedure and did not reurge his motion during voir dire. On appeal, he argued that the trial court erred in failing to hold a hearing.
The Supreme Court held that the trial court was reasonable in deferring a hearing until voir dire and that the defendant's failure to request a hearing at that time precluded the defendant from complaining of the issue on appeal.
In this case, there was no deferment of a hearing until voir dire; the court simply never ruled on the motion. However, the prospective jurors were questioned in some depth about what they had read and heard about the crime and all parties learned what they knew in that regard. Further, the court admonished the jurors not to listen to or read any media accounts about the trial. It can not be said that the atmosphere was so corrupt by press coverage that a change of venue was required.
In the absence of an objection to the failure of the court to hold a hearing or rule on the motion combined with the opportunity to develop information about the issue on voir dire and the court's cautionary instructions, the absence of a hearing or ruling on this motion does not present reversible error.
These assignments of error are without merit.

MOTION IN LIMINE
By means of assignment of error number four, defendant contends that the trial court erred when it failed to rule on the defendant's Motion in Limine. On December 5, 1995, the defendant filed a Motion in Limine seeking to exclude any evidence of the events after the defendant left the victim's house. This was evidently an effort to have the evidence excluded under La. C.E. art. 404(B) even though the motion did not cite that article. The issue was argued to the trial court. The trial court deferred ruling on the issue until the morning of trial. As the defendant points out, the trial court never ruled on the motion and this evidence was introduced.
As noted in the facts, the state presented extensive evidence regarding the events which took place after the defendant and Smith left Mrs. Wallace's home. The defendant did not object to any of this testimony on the grounds that it was in violation of La. C.E. art. 404(B).
The defendant asserts on appeal that Smith's testimony regarding the kidnaping and aggravated rape was inadmissible and prejudicial other crimes evidence and that the trial court erred by failing to exclude it. The state argues that the defendant waived his right to raise this issue because of his failure to object at trial and, in addition, argues that the evidence was part of the res gestae of the offense and thus admissible.
Citing La.C.Cr.P. art. 841, this court recently refused to consider an other crimes challenge on appeal in a case where a defendant had filed a motion in limine to exclude inadmissible other crimes evidence but neglected to object to the introduction of that evidence at trial. State v. Bosley, 29,253 (La.App.2d Cir. 04/02/97), 691 So.2d 347. In that case, the defendant's motion in limine was denied.
However, in State v. Walters, 25,587 (La. App.2d Cir. 01/19/94), 630 So.2d 1371, writ denied 95-0422 (La.06/16/95), 655 So.2d 340, *751 this court expressly held that no contemporaneous objection was required to evidence which the defendant had unsuccessfully sought to have excluded by a motion in limine. The court cited La.C.Cr.P. art. 841(B) and State v. Parker, 421 So.2d 834, 840 (La. 1982), cert. denied 460 U.S. 1044, 103 S.Ct. 1443, 75 L.Ed.2d 799 (1983). The evidence in that case was hearsay, not other crimes.
La.C.Cr.P. art. 841 provides, in pertinent part:
A. An irregularity or error cannot be availed of after verdict unless it was objected to at the time of occurrence. A bill of exceptions to rulings or orders is unnecessary. It is sufficient that a party, at the time the ruling or order of the court is made or sought, makes known to the court the action which he desires the court to take, or of his objections to the action of the court, and the grounds therefor.
B. The requirement of an objection shall not apply to the court's ruling on any written motion.
C. The necessity for and specificity of evidentiary objections are governed by the Louisiana Code of Evidence.
In the Parker case, the Supreme Court considered a defendant's other crimes challenge to events surrounding his arrest even though he did not make a contemporaneous objection to the testimony because the trial court had denied his motion in limine.
In this case, the record reflects no ruling from the trial court on the defendant's motion. Although the defendant made no objection to the absence of a ruling, the record shows that the issue was vigorously argued between the parties and that the court was aware that the question was in controversy. The trial court should have ruled on the motion. Under the circumstances, this court follows the Parker and Walters reasoning and will consider the issue.
La. C.E. art. 404(B)(1) provides:
Except as provided in Article 412, evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, of the nature of any such evidence it intends to introduce at trial for such purposes, or when it relates to conduct that constitutes an integral part of the act or transaction that is the subject of the present proceeding.
The language at the end of this article has been substituted for the vague res gestae doctrine. As there was no objection to the evidence itself, there was no objection that the state had provided inadequate notice (under Prieur) that the evidence would be introduced, the notice issue has thus been waived. See La.C.Cr.P. arts. 720, 841; State v. Kahey, 436 So.2d 475, 489 (La.1983).
At the outset of its case, the state noted that it intended to prove either that the defendant shot the victim with the specific intent to kill or that he shot the victim while he was perpetrating aggravated burglary, aggravated kidnaping or armed robbery. Under the latter theory [La. R.S. 14:30.1(A)(2) ], certainly the kidnaping evidence becomes "an integral part of the act or transaction that is the subject of the instant proceeding." Further, the defendant, not the state, brought out the evidence of aggravated rape for the first time.
Moreover, one element of Brown's defense, when such were apparent, was that Smith was culpable either directly or indirectly for her mother's death. This is a question of trial strategyif the defendant elected not to testify (and he did not testify), then there was only one witness available to testify to the circumstances of this killing. Consequently, that witness' credibility is a key point; it is well established that one witness' testimony, if believed by the trier of fact and uncontradicted by physical evidence, is sufficient to support a factual finding. State v. Moore, 29,212 (La.App.2d Cir. 01/22/97), 687 So.2d 647, 651.
The defendant made a number of attacks on Smith's credibility through the testimony of several witnesses. He pointed out several *752 contradictions between Smith's testimony about her relationship with the defendant, including a showing that she was a frequent visitor at his home, apparently in an effort to show that Smith loved the defendant and wanted to be with him. Some of the most dramatic evidence on that point was Smith's testimony that, after the defendant shot her mother, Smith told the defendant that she loved him and that they could go away together and be a family. Smith testified that she said those things to pacify the defendant, not because she meant them.
However, in his motion in limine, the defendant stated:
Defendant shows that such evidence [of other crimes] is not admissible because it constitutes evidence of separate and distinct crimes quite separate and apart from the charge against defendant. Defendant would further show that Shannon Smith instituted the flight from the house to Mississippi by plan and design by telling defendant that she loved him and that they ought to run away together as a family.
Thus, the record reflects that the defendant knew that this evidence bore strongly upon the credibility of Shannon Smith and suggests that the defendant intended to show that Smith had some complacency, if not involvement, with the killing of her mother. Defendant introduced evidence that Smith was a frequent visitor to his home and that her personal belongings were found there on the morning after the killing. If the defendant could show that his actions were prompted in some way by Smith, he could reduce his culpability for the crime. Accordingly, it is possible that the defendant elected not to pursue exclusion of this evidence as a strategy designed to impugn Smith's credibility and to reduce his own culpability for the offense.
In short, the record reveals that the evidence of the events after the shooting bore heavily upon the state's case under La. R.S. 14:30.1(A)(2) and upon the credibility of the state's principal witness, which, in turn, was a critical issue at trial. The defendant's failure to object to the evidence, while not precluding him from review on appeal, nevertheless is indicative of his desire to pursue that avenue of attack against the state's evidence. On this record, this assignment of error does not present reversible error.
This Assignment of error is without merit.

MOTION FOR NEW TRIAL
The defendant contends in assignment of error number six that the trial court erred by failing to grant defendant's Motion for New Trial. Although the defendant has argued this assignment in the same section as his Batson assignment, the issues are addressed separately in this opinion. The defendant has presented additional argument on the issue in his supplemental brief.
The defendant argues that the presence of a juror on the jury who is related to the victim prevented him from having a fair trial and presents reversible error. Among the prospective jurors was a Mrs. Rhonda Higgins, an L.P.N. at St. Francis Hospital. Smith, the victim's daughter, was also employed at St. Francis, but in the Chemistry Department. During voir dire, the state asked the jury panel whether they knew the victim. Mrs. Higgins did not speak up and say anything. Defense counsel specifically asked Mrs. Higgins if she knew Shannon Smith; the juror said that she did not. Mrs. Higgins was selected as a juror.
On the last day of the trial, March 28, 1996, it came to the attention of the court that Mrs. Higgins may have been related by marriage to the victim and her daughter. The court heard testimony on the issue. During the inquiry into the matter, Mrs. Higgins denied knowing Shannon Smith but admitted that she had seen her a couple of times at the hospital where they worked. Mrs. Higgins also denied any knowledge that she was related to Smith by blood or marriage. She was questioned regarding an allegation that her brother or nephew is married to a cousin of Smith's. The court asked if there was any relationship that would affect her ability to render a fair and impartial verdict in this case. Mrs. Higgins responded in the negative. There was no further discussion of the issue or objection by the defendant that the juror should be dismissed.
*753 On May 2, 1996, the defendant filed a motion for new trial, alleging four grounds for relief:
1. The verdict is contrary to the law and the evidence.
2. The ends of justice would be served by granting a new trial.
3. One of the jurors was related to the victim and her daughter.
4. Blacks were disproportionately under represented in the petit jury venire.
A hearing was held on this motion. The hearing is almost completely comprised of testimony regarding the relationship between Mrs. Higgins and the victim's daughter. However, the defendant did briefly offer evidence concerning the black population of Ouachita Parish in support of his fourth argument.

A. Juror/Witness Relationship.
Eight witnesses were called on the juror issue. After the testimony concluded, the court ruled that it was unclear whether there was any relationship between the juror and the witness and, since the jury verdict was unanimous, the court denied the motion for a new trial.
On appeal, the defendant urges that Rhonda Higgins and Smith were cousins and that Mrs. Higgins presence on the jury thus presented reversible error. The state disagrees, stating that the juror had a cousin who was married to the witness' cousin and that the juror was unaware of this relationship until after the verdict had been rendered.
This court has considered and rejected an argument similar to defendant's in State v. Holland, 544 So.2d 461 (La.App. 2d Cir. 1989), writ denied, 567 So.2d 93 (La.1990). This court described the factual situation in that case this way (544 So.2d at 465):
On the morning of the fourth day of trial the judge received a letter from a juror, Arlon Cole. On the previous evening Cole's daughter had informed him she received a telephone call from a person who identified himself as Bill Haynes, a venireman who had been excused. The person told her his (Bill Haynes's) grandfather was related to the victim and that Haynes believed he was related to Cole. Cole reported this to the judge and testified that he did not know whether he was in fact related to Bill Haynes nor was he aware of the degree of kinship between Haynes and the victim. Cole stated that even if he were in some way related to Haynes (and thus the victim), it would not affect him or the process of his decision making, he could be fair and impartial.
The defendant challenged the juror for cause and moved for a mistrial; the trial court denied both requests. On appeal, this court held that the trial court correctly denied the challenge for cause because "the juror testified, and the judge found, that any possible relationship would not impair the juror's ability to be impartial." La.C.Cr.P. art. 797(3), the pertinent article on challenges for cause, provides.
The state or the defendant may challenge a juror for cause on the ground that:
(3) the relationship, whether by blood, marriage, employment, friendship, or enmity between the juror and the defendant, the person injured by the offense, the district attorney, or defense counsel, is such that it is reasonable to conclude that it would influence the juror in arriving at a verdict.
Citing State v. Hodgeson, 305 So.2d 421 (La.1974) and State v. Peterson, 446 So.2d 815 (La.App. 2d Cir.1984), this court also held that disclosure during the trial that a juror is related to the victim does not necessarily prevent a fair trial. Because in that case the juror was unaware of his relationship to the victim and there was no evidence that the relationship would interfere with the defendant's right to a fair trial, this court held that mistrial was properly denied.
As set forth above, the court in this case heard testimony on the question both when the issue arose and when the defendant complained after trial. When the issue arose, the juror said that she was unaware of any relationship with the witness and, if there was one, that it would not interfere with her impartial consideration of the evidence. In the post-trial hearing, none of the witnesses testified that the juror and the witness knew one another, and both Smith and Rhonda *754 Higgins testified that they did not know each other before the trial.
On this record, therefore, there is insufficient evidence that the juror's relationship with the witness was an impairment to her ability to reach a fair verdict or, for that matter, that the relationship would influence her decision in the slightest degree. On this record, this assignment of error does not present reversible error.

B. Underrepresentation of Minorities in the Venire
In his motion for new trial, the defendant also alleged that black jurors were disproportionately underrepresented in the petit jury venire. Included in that motion was a simple mathematical analysis of the percentage of minorities in the parish (either 40% or 38.4%) compared with the number of minorities (1) in the initial venire (10/36 or approximately 27.77%), (2) available for service (5/30 or approximately 16.67%) and (3) actually on the jury (1/12 or approximately 8.34%). The trial court did not specifically address this contention when it denied the motion for a new trial.
The defendant has reurged these challenges on appeal, indicating that the underrepresentation denied the defendant the equal protection of the law. The state has not addressed this contention in its brief.
The defendant did not file a motion to quash the jury venire pursuant to La.C.Cr.P. art. 419, which provides:
A. A general venire, grand jury venire, or petit jury venire shall not be set aside for any reason unless fraud has been practiced, some great wrong committed that would work irreparable injury to the defendant, or unless persons were systematically excluded from the venires solely upon the basis of race.
B. This Article does not affect the right to challenge for cause, a juror who is not qualified to serve.
A defendant making such a motion bears a heavy burden of establishing grounds to quash the venire. State v. Lee, 559 So.2d 1310, 1313 (La.1990), cert. denied, 499 U.S. 954, 111 S.Ct. 1431, 113 L.Ed.2d 482 (1991); State v. Davis, 626 So.2d 800 (La.App. 2d Cir.1993), writ denied, 93-2945 (La.02/25/94), 632 So.2d 762. A showing of mere underrepresentation of blacks on the venire will not suffice. State v. Anderson, 315 So.2d 266 (La.1975); State v. Tucker, 591 So.2d 1208 (La.App. 2d Cir.1991), writ denied 594 So.2d 1317 (La.1992); State v. Matthews, 552 So.2d 590 (La.App. 2d Cir.1989), writ denied 559 So.2d 137 (La.1990).
A defendant will not be heard to complain unless he can show that the exclusion of black persons from the venire was not a nondiscriminatory, random process. State v. Bourque, 622 So.2d 198 (La.1993); State v. Monk, 315 So.2d 727 (La.1975). The defendant must establish a prima facie showing of such systematic exclusion before the state is required to show the exercise of its peremptory challenges was not discriminatory. The defendant must show both underrepresentation on the venire, and some systematic act tending toward race-based exclusion of potential jurors.
The defendant has alleged that the state exercised its peremptory challenges based upon the race of the jurors but has not even alleged that the method for selecting the jury venire in Ouachita Parish systematically excludes blacks from service. All he has shown is a possible underrepresentation based upon the percentages he asserts to be correct. The defendant has produced no evidence of a history of systematic exclusion. This is insufficient, particularly when he has not filed a motion to quash the venire and failed to raise the issue at a time when it could be corrected before the trial was held. A defendant is not denied equal protection when the state exercises its peremptory challenges to exclude black persons in a particular case, unless there has been a systematic exclusion of them over a period of time.
This assignment of error is without merit.

BATSON CHALLENGE
By means of assignment of error number seven, the defendant argues that the trial court erred in denying the defendant's Batson challenge, accepting the state's reason for challenging juror Hayward and for failing *755 to make the state provide race-neutral reasons for challenging three other jurors.
During voir dire, the defendant alleged that the state exercised peremptory challenges against four potential jurorsDonna Hayward, Anthony Zeigler, Delles Howell and Corona Gracebecause the jurors were black, and that these challenges were in violation of Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). The court held a hearing to determine the merits of the allegation. The court found that the defendant had made a prima facie showing of discrimination only for potential juror Donna Hayward. After the state provided an explanation for the challenge, the court held that the defendant had failed to show that the challenge was exercised because of the juror's race. The defendant objected to this ruling and the ruling that he had not made a prima facie case for the other challenges.
On appeal, the defendant urges that the trial court erred in accepting the state's reason for challenging Hayward and for failing to make the state provide race-neutral reasons for challenging the other three jurors.

A. Donna Hayward
The defendant sets out in brief most of the pertinent answers that this juror gave during voir dire. Hayward said that she would be able to serve on the jury even though the defendant would serve a life sentence if convicted. She gave responsive answers to the prosecutor's questions about reasonable doubt and said that some seemingly insignificant details might prove to be important elements of the state's proof. She said that she understood the elements of proof for murder and indicated that she didn't understand the prosecutor's question when he engaged her in a quickly-presented analogy comparing a puzzle with missing pieces to the concept of reasonable doubt.
The prosecutor then slowed down and engaged Hayward in a colloquy about reasonable doubt. During their exchange, the juror indicated that she would not hold it against the defendant if he did not testify, followed the prosecutor's hypothetical about circumstantial evidence and said that she believed that people should be punished for their wrong behavior. She said that she "wouldn't care for" a man who victimizes a woman. She stated that she had been the victim of a burglary but had no negative feelings toward the police because they were unable to locate the burglars and would not hold this crime against the defendant. She also said that she thought she would be able to tell whenever a witness was lying or telling the truth and would not be influenced by prejudicial factors.
Defense counsel described in some detail the concept of reasonable doubt and how that burden of proof differed from a preponderance. Ms. Hayward agreed that she could accept that and would acquit the defendant if the state did not prove its case beyond a reasonable doubt.
The prosecutor did not excuse Ms. Hayward during the first round of challenges but did so in the second round. The defendant's Batson motion was made before the jury was sworn and was discussed afterwards. Even if the motion was untimely, the state did not object to the timeliness so the defendant is entitled to review of the issue. State v. Green, 94-0887 (La.5/22/95), 655 So.2d 272.
At the hearing, the court said that it listened very carefully to the voir dire of the prospective jurors and ruled that the defendant did not make a prima facie showing of discrimination except in the case of Ms. Hayward. The state responded with the following explanation:
Yes, Your Honor. May it please the court, the two primary areas of concern that the State had as it relates to Ms. Hayward. During the voir dire at one point in time Ms. Hayward made the statement that she would want the State to eliminate all doubt. She was successfully rehabilitated, however, that statement still stuck in our minds as to ... as the Court well knows, depending on how we word these questions we can get just about any answer we want to, and we were afraid that the want to eliminate all doubt would still be stuck in her head once she got into deliberations due to the severity of the punishment involved. Secondly, and more importantly, *756 we note from the questionnaire that Ms. Hayward is employed at J.B. Cooley, and although, according to this questionnaire, she was not a counselor there, she still worked there in which she dealt with counselors on a daily basis, and we do not ... the State does not like to have people who are counselors on a jury because they tend to want to forgive and to rationalize why someone may have done something.
The defendant made no further argument, and the court denied the defendant's challenge.
On appeal, the defendant urges that the trial court erred in finding that the state's reasons for challenging Ms. Hayward were sufficient. In a brief argument, the state urges that the reasons were adequate.
The Equal Protection Clause of the Fourteenth Amendment prohibits the state and the defendant from challenging potential jurors solely on account of their race. Batson v. Kentucky, supra; Georgia v. McCollum, 505 U.S. 42, 112 S.Ct. 2348, 120 L.Ed.2d 33 (1992); see also La.C.Cr.P. art. 795(C). Either the prosecutor or defense counsel may raise a Batson objection, but the objecting party is required to establish a prima facie case of purposeful discrimination. Such a prima facie case is shown when the pertinent circumstances raise an inference that defense counsel or the prosecutor used peremptory challenges to exclude venire members of a cognizable racial group from serving on the jury solely because of race. State v. Collier, 553 So.2d 815 (La.1989); State v. Rose, 606 So.2d 845 (La.App. 2d Cir.1992). Once the objecting party makes its prima facie case, the burden shifts to the party who lodged the peremptory challenge to come forward with a race-neutral explanation for the challenge. The explanation need not rise to the level of a challenge for cause, but it may not be based on the assumption or intuitive judgment that the excused venire member would not be impartial because of his or her racial identity. The explanation must be clear, racially neutral, reasonably specific and related to the case at bar. State v. Collier, supra; State v. Wilson, 25,775 (La.App.2d Cir. 2/23/94), 632 So.2d 861. With the objecting party's prima facie case and the challenging party's rebuttal, the trial court must determine whether the objecting party has established purposeful discrimination. State v. Powell, 598 So.2d 454 (La.App. 2d Cir.), writ denied, 605 So.2d 1089 (1992). The reasons given for exercising a peremptory challenge need only be plausible. Purkett v. Elem., 514 U.S. 765, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995); State v. Seals, 95-0305 (La.11/25/96), 684 So.2d 368, 375. The trial court's determination rests largely on a credibility determination and is entitled to great discretion. Batson v. Kentucky, supra at note 21; State v. Collier, supra.
The state's first reason for excusing the jurorthat she initially asked for proof to a certainty of the defendant's guiltis plausible. As the U.S. Supreme Court noted in Purkett, supra, the focus of the inquiry is upon the genuineness of the state's motive rather than on the reasonableness of the motive. Even though the juror was rehabilitated on the issue and thus not susceptible of a challenge for cause, the state might well be concerned about her ability to correctly apply the law. A juror's ability to consider the evidence in light of the correct burden of proof is of great concern to both the state and the defendant. When a juror expresses a belief that the state must prove the defendant's guilt to a certainty, the prosecutor should be entitled to consider that statement in meting out peremptory challenges. Nothing suggests that this reason in this case was a pretext for a race-based challenge.
The other reason cited by the statethat the juror might have a tendency to forgive because she worked with counselorsfinds thin support in the record. As the defendant points out, the state asked the juror nothing about her employment during voir dire. Nevertheless, because concern over the juror's ability to apply the correct burden of proof is a race-neutral reason supported by the record, the trial court did not err in finding that the defendant had failed to prove his Batson challenge.

B. Anthony Ziegler, Delles Howell, Sr. and Carona Grace.
The trial court found that the defendant had failed to make out a prima facie case of *757 discrimination against this juror. The defendant objected to this finding at trial and urges on appeal that the ruling is reversible error.
To make out a prima facie case of discriminatory jury selection, defendant must first show that the prosecutor has exercised peremptory challenges to remove members of a particular race from the venire. Powers v. Ohio, 499 U.S. 400, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991). A prima facie case of discriminatory jury selection is not established where a defendant shows only that blacks were excluded from the petit jury, but fails to set forth any other circumstances to support his claim of discrimination. State v. Caldwell, 28,514 (La.App.2d Cir. 8/21/96), 679 So.2d 973, 976, writ denied 96-2314 (La.02/21/97), 688 So.2d 521.
Each of the three jurors complained of was black. However, the voir dire of each juror elicited responses which support the court's finding that the jurors were excused for reasons other than their race.

1. Anthony Ziegler
Defense counsel engaged in a lengthy and fairly unusual colloquy with this juror. Counsel had just finished asking another prospective juror, Mr. Cook, whether his background as an insurance adjuster would interfere with his service on the jury; the juror said that he would probably not want someone like him on the jury if he were the defendant. Counsel then asked Anthony Ziegler whether he would want someone with his background on the jury if he were the defendant. Mr. Ziegler answered that he didn't know, and that in some ways he would and some ways he wouldn't. He later said that his wife works for the Department of Probation and Parole and the he felt that, in regard to people charged with crimes, "some I feel get shafted and some I don't." Counsel again asked Mr. Ziegler whether he would want someone on his jury like himself, and the record clearly reflects that this juror expressed doubts about his ability to sit in judgment and fairly review the state's case. This record amply supports the trial court's conclusion that Mr. Ziegler was not excused on account of his race.

2. Delles Howell, Sr.
The prosecutor started his voir dire with Mr. Howell because the two knew each other as members of the board of directors of the Twin City Athletic Association. Mr. Howell knew some of the family members of both the victim and the defendant. The prosecutor asked the prospective jurors whether they had heard anything about the case. During the exchange, this juror stated that he had read the newspaper accounts and heard people in the community talking about the case. The juror further stated that he knew some more surrounding circumstances, other than the fact of what he read in the paper, things that he was personally involved with.
On the other hand, when the prosecutor asked the juror whether he thought he could put everything else out of his mind and listen to the evidence as presented and make a determination on that, and not drawn or reserve on some more information he may have from some other source, Mr. Howell responded in the affirmative. This shows that the juror seems to have been rehabilitated.
If this was a challenge for cause question, the defendant's argument might have merit because the juror seems to have been rehabilitated. However, the colloquy above is ample race-neutral justification for a peremptory challenge. The juror made it clear that he was aware of "surrounding circumstances" concerning the families of the parties involved. That admission could be full of prejudice toward either side that the juror might not be able to suppress when considering the case. The trial court's decision that this challenge was not based upon the juror's race has ample support in the record.

3. Carona Grace.
Contrary to the defendant's assertion in brief, Mrs. Grace said that she did not know any members of the families involved. During the exchange that occurred immediately thereafter, Mrs. Grace was repeated asked by the prosecutor whether she can tell when *758 somebody's telling the truth or not and the juror responded in the negative.
Even from the cold record, this juror's answers to these questions appear either disingenuous or hostile. The credibility of the witnesses was one of the more important elements of this case, and a juror's claimed inability to measure that credibilitygenuine or notis a race-neutral justification for a peremptory challenge.
Because the record supports the trial court's finding that the state did not peremptorily excuse jurors because of their race, this assignment of error is without merit.

JURY'S REQUEST FOR THE 911 TAPE (Defense Exhibit No. 9)
In assignment of error nine, the defendant contends that the trial court erred by not granting the jury's request for the 911 tape for consideration during deliberations. The minutes of court reflect that, after the jurors began deliberations, they requested that the court permit them to hear the 911 tape. The minutes reflect that the request was denied. However, the minutes do not reflect that the defendant objected to the court's ruling on the issue.
Nevertheless, the defendant has argued rather extensively in brief that the trial court's ruling was error. The state argues that the defendant has suffered no prejudice from the court's ruling even if that ruling was wrong.
Failure to make an objection to the trial court's refusal to permit the jury to examine particular evidence precludes appellate review of the issue. State v. Billiot, 370 So.2d 539 (La.1979), cert. denied, 444 U.S. 935, 100 S.Ct. 284, 62 L.Ed.2d 194 (1979); State v. Duncan, 94-1045 (La.App. 4th Cir.12/28/94), 648 So.2d 1090, 1101, writ denied 95-0662 (La.06/30/95), 657 So.2d 1028, cert. denied ___ U.S. ___, 116 S.Ct. 1020, 134 L.Ed.2d 99 (1996); State v. Hebert, 443 So.2d 613, 619 (La.App. 3rd. Cir.1983), writ denied 444 So.2d 1215 (La.1984).
Moreover, as noted in the facts, the 911 tape contains no intelligible speech except for the 911 operator's standard greeting"911... What's you're emergency?" The defendant cites a great deal of law in his brief but does not explain how he was prejudiced by the court's ruling.
This assignment of error is without merit.

MOTION IN LIMINE FILED BY THE STATE

INADMISSIBILITY OF MEDICAL RECORDS, AFTER THE IN-CAMERA INSPECTION

RESTRICTING DEFENDANT'S OPENING STATEMENT REGARDING MENTIONING THE ISSUE OF "ABORTION"
In assignments of error three, eight, and ten, the defendant complains that the trial court made a reversible error in granting the state's motion in limine, by ruling that Shannon Smith's records from Dr. Roderick Hundley were inadmissible, after the in-camera inspection, and by restricting defendant's opening statement regarding mentioning the issue of "abortion" concerning motive and credibility of a state's witness to fabricate testimony against defendant, thereby refusing to allow defendant to put on evidence that Shannon Smith had aborted their baby.
The state's motion in limine asserts facts that seem to pertain to the jury selection on the first trial which ended in a mistrial due to very severe weather that prevented the state's witness from being present. The state urged that, during voir dire, "defense counsel has determined from each jury panel who is pro life" and that "the people not excluded by defense counsel have indicated that they are pro life." In the motion, the state admitted that Smith had an abortion but denied that the abortion had any relevance to the case. The motion asked that the court require the defendant to lay a foundation for the relevancy of questions about abortion before being allowed to present evidence on that issue.
The motion was evidently reurged at the second trial, although the defendant did not question the jurors about their opinions on abortion. The court granted the motion and restricted the defendant from commenting on *759 abortion during his opening statement. The defendant sought writs on the issue from this court. The writ was denied, noting that the defendant would have an adequate remedy on appeal in the event of conviction. The defendant then sought writs from the Supreme Court and his application was again denied.
After opening statements but before trial on the merits began, the court discussed the issue with the parties. The court told defense counsel the restriction was on defense comments in the opening statement and that the ruling did not go to defense ability to cross-examine the State's witnesses and to test veracity and credibility. The court told the defendant that it would rule on the matter if and when it came up.
During the cross-examination of Shannon Smith, defense counsel asked the witness about whether the defendant had gone back to New York in July 1993, and whether she had spoken with the defendant's mother in New York by telephone. When Smith answered that she had spoken with the defendant's mother, counsel requested that the jury be taken out. He then elicited from the witness that she was pregnant at the time but that she did not remember telling this to the defendant's mother. Later, the witness testified that she had seen various doctors and, in September, that she had terminated her pregnancy by abortion at the Bossier City Medical Clinic. She said that she knew that the defendant planned to return to New York before she told him that she had an abortion and before she filed the rape complaint against him.
The state objected to the defendant questioning Smith about the abortion on the grounds that the questions would be irrelevant. The defendant argued that the questions were relevant to show that the witness created a series of fabrications in order to get the defendant to stay in Monroe with her. The court ruled that the defendant could question the witness about everything except for the issue of abortion. The defendant did not object to this ruling, and the jury was brought back in.
Further examination of the witness revealed to the jury that the witness and the defendant had consensual sex in the beginning of their relationship and that the witness learned that she was pregnant sometime in August. The witness said that she eventually broke up with the defendant because her religious belief that premarital sex was wrong. The following colloquy then occurred:
Defense counsel: Did you do anything else that the Bible forbade or forbade in reference to sex?
[State objection is made and overruled.]
Defense counsel: Did you do anything relative to sex that the Bible forbade or forbade?
Witness: Yes, I did.
Defense counsel: What was that?
[State objection is made and sustained.]
After this exchange, the witness testified that she did not know whether the police believed her about the rape complaint but that the police did not arrest him. [The jury later learned that the witness had one child and that this child was born in April 1990.]
After examination about unrelated matters, the court took a recess. Before the witness was recalled, the attorneys discussed with the court a subpoena issued for the records of a Dr. Roderick Hundley, "a psychiatrist to one of the victim's family members." Defense counsel noted that all the other doctors subpoenaed had surrendered their records except for the psychiatrist and that his records were "perhaps the most critical." Defense counsel said that he was only interested in the records of Shannon Smith and then only during the period of "July '93 up to November 28th of '90 ... '93. It's a very limited period we're talking about." The judge said that he might obtain the records and conduct an in camera inspection.
Later on cross-examination, Smith testified that she had seen a psychiatrist after her mother died because "I had tried to commit suicide, and I ended up at Woodland Hills, and that's when I was treated."
After the close of the state's case, the trial court indicated that it had reviewed the psychiatrist's records and found that they contained *760 nothing relevant or admissible as evidence in the defendant's case. The court directed that the records be sealed and made part of the record of the proceeding. The defendant made no objection to the court's ruling.
On appeal, the defendant urges that his right to present a defense was impermissibly curtailed by the exclusion of evidence about the witness' abortion. He argues that the evidence would have gone toward Smith's "motive to fabricate" and would have tended to show "that Shannon Smith had lied to defendant relative to her abortion to keep him from leaving her and returning to New York." He also complains that his ability to conduct jury selection and arguments was impaired by the limitation on this evidence. The state argues that the defendant "was in fact able, and did question concerning an alleged abortion," and that the defendant was not prejudiced by the court's ruling.
The questions before the court are (1) whether the trial court's ruling that the abortion evidence was irrelevant impermissibly curtailed the defendant's rights to confrontation and cross-examination of witnesses and (2) whether the court erred in excluding the medical records.

A. Abortion evidence.
As the Supreme Court stated in State v. Van Winkle, 94-0947 (La.06/30/95), 658 So.2d 198, 201-202:
A criminal defendant has the constitutional right to present a defense. U.S. Const. amend. 6; La. Const. Art. 1 Sec. 16; Washington v. Texas, 388 U.S. 14, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967); State v. Gremillion, 542 So.2d 1074 (La.1989); State v. Vigee, 518 So.2d 501 (La.1988). Due process affords the defendant the right of full confrontation and cross examination of the State's witnesses. Chambers v. Mississippi, 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973); State v. Mosby, 595 So.2d 1135 (La.1992). It is difficult to imagine rights more inextricably linked to our concept of a fair trial.
Evidentiary rules may not supersede the fundamental right to present a defense. Louisiana courts have been willing to disregard the rules of evidence in certain cases where the defendant sought to introduce evidence central to his defense but otherwise inadmissible.
In Van Winkle, supra, the court reversed the conviction of a woman convicted of killing her son because the trial court impermissibly limited questioning of a prosecution witness. The facts revealed that the 12-year-old boy had been suffocated, that his anus was dilated and that oral and anal swabs revealed the possible presence of seminal fluid. The defendant's theory of the case was that her 20-year-old male roommate killed the child. She sought to introduce evidence that the roommate was a homosexual, a "hustler," and the results of the swab tests could prove or disprove sexual assault. The trial court refused to allow this evidence because "there was no proof that any homosexual activity occurred." Evidently, this was a ruling on the relevance of the evidence.
The Supreme Court reversed, holding that this evidence was highly relevant and went directly toward the proof of the defendant's theory of the case. The Court also held that the improper exclusion of the evidence might have contributed to the conviction and that the error was not harmless beyond a reasonable doubt.
The Court also briefly noted the facts of Gremillion, supra, and Vigee, supra. Both of those casesin which the court reversed the defendant's convictioninvolved the exclusion of evidence that tended to disprove the state's case. In Gremillion, the evidence was an inadmissible hearsay statement from the victim that persons other than the defendant had committed the crime. In Vigee, the evidence was, in part, inadmissible hearsay tending to show that another person committed the crime.
In State v. Harper, 93-2682 (La.11/30/94), 646 So.2d 338, the supreme court reversed a defendant's conviction because the court improperly excluded evidence supporting the credibility of a defense witness. The defendant was convicted of distribution of cocaine; an undercover officer identified him as the seller. The defendant claimed misidentification and presented his girlfriend as an alibi *761 witness. The girlfriend testified that the defendant was with her on the day of the transaction and claimed to remember the specific day because of a shooting that she said happened near her mother's house that she read about in the paper on the day of the transaction. The state introduced evidence that the story in the paper was printed the day after the crime and that the story gave a different time for the event than did the witness. The defendant then sought to introduce the police report of the shooting which tended to corroborate the witness' story, but the court refused to admit this evidence.
The court reversed the defendant's conviction, holding that the newspaper story severely damaged the witness' credibility and that the court's refusal to permit the defendant to introduce evidence which contradicted the newspaper and supported the witness' story impermissibly curtailed the defendant's right to present a defense.
In each of these cases, the evidence excluded by the trial court was directly relevant to a critical issue in the trial. Moreover, the evidence in question tended either to contradict the state's version of the case or the state's challenge to the credibility of a witness. In the case sub judice, the credibility of Shannon Smith was a critical part of the state's case. However, the limitation of questioning about Smith's abortion does not rise to the level of reversible error. There was no evidence, by way of medical records, that Smith did not have an abortion. She testified (during argument, when the jury was not present) that she could not recall the name of the doctor at Bossier Medical Clinic who performed the abortion. The defendant has not shown that he would have been able to refute this claim.
Because the defendant could not show that Smith was lying about having an abortion, her testimony in that regard would not be probative on the issue of her credibility. The defendant has thus not shown on appeal how introduction of testimony about abortion would tend to show the witness'" motive to fabricate" as he urges in brief. Thus, the issue becomes simply a question of relevance under La. C.E. arts. 401 and 402, and whether or not Smith aborted the defendant's child is irrelevant to the proceedings without a contradictory showing as described above.

B. Medical records.
At the time he sought access to the records of Smith's psychiatrist, the defendant said that he was only interested in treatment between July 1993 and November 1993. The psychiatrist records in this record begin on June 20, 1994. Further, they contain nothing of relevance to the defense and primarily reflect technical descriptions of Smith's difficulties at that time. The trial court did not err in refusing to permit these highly sensitive personal records into evidence.
These assignments of error are without merit.

ERROR PATENT
The charge against this defendant was initially first degree murder, and the charge was brought by grand jury indictment filed on December 6, 1993. However, on September 21, 1995, the state filed a "Superseding Bill of Information" charging the defendant with second degree murder. Apart from the change in the offense, the act charged in this bill (the murder of Betty Wallace) was the same as that charged in the indictment. La. Const. art. 1, § 15 and La. C.Cr.P. art. 382(A) provide that prosecution for crimes punishable by life imprisonment must be initiated by grand jury indictment. See State v. Ruple, 437 So.2d 873 (La.App. 2d Cir.1983). This "supplemental bill" is not exactly an amendment of the indictment, but since prosecution was originally instituted by indictment and the defendant did not complain of the procedure, the error seems harmless. Amendments to indictments reducing a charge from first to second degree murder are permissible because the greater charge includes all the elements of the lesser charge. State v. Davis, 385 So.2d 193, 197 (La.1980).
The trial court failed to give the defendant credit for time served in custody prior to the imposition of sentence. La.C.Cr.P. Art. 880. State v. Johnson, 95-1002 (La.App. 3 Cir.3/6/96), 670 So.2d 651. We note that the trial court's failure to give the defendant *762 credit towards service of his sentence for time spent in actual custody prior to imposition of sentence would have been error patent prior to the amendment of La.C.Cr.P. Art. 880 and would have been corrected by an order to amend sentence to reflect credit for time served. However, the amendment of La.C.Cr.P. Art. 880 is designed to make the credit for prior custody self-operating even on a silent record. Therefore, the statute does not require us to take action.

CONCLUSION
For the reasons given above, the defendant's conviction and sentence are affirmed.
AFFIRMED.